C.K. Lee, *to be admitted pro hac vice*
**LEE LITIGATION GROUP, PLLC**
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
Email: cklee@leelitigation.com

David Makman, Esq.
CA Bar No.: 178195
**LAW OFFICES OF DAVID A. MAKMAN**
655 Mariner's Island, Suite 306
San Mateo, CA 94404
Tel: 650-242-1560
Fax: 650-242-1547
Email: david@makmanlaw.com

*Attorneys for Plaintiffs*
*and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHRISTIAN SPONCHIADO and
COURTNEY DAVIS, on behalf of
themselves and all others similarly
situated,

Plaintiffs,

v.

APPLE INC.,

Defendant.

Case No.:  [Case No.]

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

[Title]

Plaintiffs CHRISTIAN SPONCHIADO and COURTNEY DAVIS, (hereinafter, "Plaintiffs"), on behalf of themselves and others similarly situated, by and through their undersigned attorneys, hereby file this Class Action Complaint against Defendant, APPLE

1   INC ("Apple" or "Defendant") and state as follows based upon their own personal

2   knowledge and the investigation of their counsel (Plaintiffs believe that substantial

3   evidentiary support will exist for the allegations set forth herein after a reasonable

4   opportunity for discovery):

## NATURE OF THE ACTION

5   1.      Apple advertises its phones by touting their display size and screen quality as

6   major selling points. Apple makes two types of claims about its screens: first, that that its

7   screens have specific high resolutions, i.e. that they have a high pixel count as tallied by

8   multiplying the screen height in pixels by the screen width in pixels. Secondly, that the

9   phones' surface area is large, as calculated by measuring the diagonal length of the screen

10  from corner to corner. However, Apple's iPhone X, iPhone XS, and iPhone XS Max

11  phones (the "Products")[1] do not have the advertised screen resolution because they do not

12  have the advertised number of screen pixels (2436×1125 in the iPhone X and XS, and

13  2688×1242 in the iPhone XS Max). Furthermore, it does not have the advertised screen

14  size as measured in inches.

15  2.      The pixel deception is rooted in the misrepresentation of the Products'

16  screens, which do not use true screen pixels. Defendant's nominal screen pixel resolution

17  counts misleadingly count false pixels as if they were true pixels. This is in contrast to

18  every other iPhone—phones whose screens Defendant *directly compares* to the iPhone X

19  screen in its effort to mislead consumers into believing that the iPhone X has more pixels

20  (and better screen resolution) than it really does.

21  3.      The screen size deception is simply based on Apple cutting corners—

22  Defendant rounds off the corners of the Products' screens and the Products have notches

23  without pixels at the top of their screens, but Defendant calculates the screen size of the

---

[1] "The Products" encompass both the 64GB and 256GB versions of the iPhone X, as well as all other phone variants Defendant sold that are advertised with false resolutions due to the use of fake pixels and missing pixels, including the 64GB, 256GB, and 512 GB variants of the iPhone XS and iPhone XS Max, as well as Defendant's phones sold with missing pixels (but no fake pixels) such as the 64GB, 128GB, and 256 GB variants of the iPhone XR.

Products by including non-screen areas such as the corners and the cut-out notch at the top of the screen.

4.      The missing screen areas also reduce the false pixel counts of the Products' screens below their advertised pixel counts.

**Defendant's False Marketing**

5.      One of the most important factors in the value and price of a phone is its screen quality, the most important factor of which is screen resolution. For this reason, Defendant's phones, including the Products, are advertised and marketed based on their screen resolution. On Defendant's website, as well as in the stores where the Products are sold, the Products are represented and advertised as having high-resolution screens. For example, the resolution specifications below are displayed on Defendant's website:



6.      Defendant's website is designed to encourage comparisons between the Products and Defendant's other phones. These comparisons are misleading because the Products[2] have false screen pixel counts that dramatically overrepresent the number of subpixels in the phones. Below are screenshots from Defendant's website (highlighting added):[3]

---

[2] The iPhone XR Products have false pixel counts due to missing screen areas and a false representation of the pixel grid size, but do not use false pixels. The other Products have false pixel counts due to the use of false pixels and missing screen areas.

[3] https://www.apple.com/iphone/compare/ (Last accessed Aug. 27, 2018).

| Mac | iPad | iPhone | Watch | TV | Music | Support | Q |

# Compare iPhone models

See all models ›

Use the drop-down menus to change models.







Silver                        Silver                        Silver

## Display

| Super Retina HD display | Retina HD display | Retina HD display |
|---|---|---|
| 5.8-inch (diagonal) all-screen OLED Multi-Touch display² | 5.5-inch (diagonal) widescreen LCD Multi-Touch display with IPS technology | 4.7-inch (diagonal) widescreen LCD Multi-Touch display with IPS technology |
| HDR display | — | — |
| 2436-by-1125-pixel resolution at 458 ppi | 1920-by-1080-pixel resolution at 401 ppi | 1334-by-750-pixel resolution at 326 ppi |

7.      The iPhone X Product is advertised as having 2436×1125 pixels, but in fact does not use true pixels with red, green, and blue subpixels in each pixel. Instead, the Product has only false screen pixels, with just two subpixels per false pixel (2436×1125×2 = 5,481,000 subpixels), and it does not actually have any subpixels at all in the notch at the top of the screen or in the display-area corners. In contrast, the iPhone 8 Plus has a higher quality screen than the Product, with more subpixels than the Product (1920×1080 pixels×3 subpixels per pixel = 6,220,800 subpixels). In contrast to the Product, the iPhone 8 Plus does not have a notch at the top of the screen or rounded corners of the display area. Defendant's comparisons of the Product to it other phones mislead consumers into believing that the Product has a better screen than it really does. Consumers, including Plaintiffs DAVIS and SPONCHIADO, relied on Defendant's marketing campaign depicting the Products as having superior screens than cheaper phones, including the iPhone 8 Plus, which has genuine pixels on its screen, a larger rectangular surface area than the Products, and is sold for less than the price of the Products.

8.      Similar false representations appear on the Products as they are sold in stores, where the phones have a built-in application to allow easy comparison among models. Plaintiff CHRISTIAN SPONCHIADO relied on these in-store comparison representations. For example, below is the iPhone X Product screen when using that application to compare the Product with the iPhone 8 Plus, displaying a false resolution in pixels and a false number of pixels per inch of screen:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**CLASS ACTION COMPLAINT**

9.      Even if the Products' false pixels were construed as if they were real pixels, the Product's advertising would still be misleading because the Products contains less screen area (with fewer pixels) than advertised. The image below shows how the edges of the iPhone X Product screen are missing about 120 vertical pixels' worth of display area on both the top and the bottom of the screen, so the Product's maximum uninterrupted display area corresponds to only about 2195×1125 pixels in in size. This is 10% less screen area than advertised:



**Width: 1125 pixels**

**Height: 2195 pixels**

The widest rectangular screen area is only about 2195 x 1125 pixels. This is about 10% less than the 2436 x 1125 pixel area that Defendants represented. The blue portions of the image are each approximately 120 pixels tall.



The edge of the screen is missing 120 vertical pixels from its advertised count on both top and bottom of the screen (40 points = 120 pixels).

10.     Defendant instructs programmers who design applications for the Product to restrict content to a "safe area" that has enough pixels to comfortably display content. This safe area excludes space on both top and bottom to account for the status bar and the missing pixels. Specifically, the safe area excludes 264 pixels (88 points) at the top of the screen and 102 pixels (34 points) at the bottom of the screen:[4]

---

[4]
https://developer.apple.com/documentation/uikit/uiview/positioning_content_relative_to_the_safe_area (Last accessed Aug. 10, 2018).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16     11.    Sales representatives selling the iPhone X Product represent its screen's

17 supposed pixel count as 2436 pixels in height by 1125 pixels in width, but these numbers

18 are not accurate for two reasons: (a) the use of fake pixels, and (b) the corner and top areas

19 of the phone that are not screen. The other Products are similarly falsely represented.

20     12.    Likewise, retailers and sales representatives falsely report the Products'

21 screen size. For example, they repeat the Defendant's misrepresentation that the screen is

22 5.8 inches. The screen is advertised as being 5.8 inches (about 5 and 13/16 inches), but is

23 only about 5.6875 inches (5 and 11/16 inches). The false size representation is premised

24 on pretending that the screen does not have rounded corners. Each corner cuts the diagonal

25 size by about 1/16 of an inch:

26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

13.     The phones themselves display their false diagonal screen sizes. For example, below is the iPhone X Product (highlighting added):



14.     Defendant falsely represents that the Product possesses a working screen area of this size by saying that it is "all screen," despite the fact that it does not have this much screen space:



15.    Plaintiffs DAVIS and SPONCHIADO relied on Defendant's representations that the Products' pixel width and height, as well as the measured diagonal screen size, were describing an area that was all screen.

16.    Defendant's advertising is designed to obscure the fact that the Products have notches at the top of the screen where pixels are missing:



17.    Defendant's advertising hides the missing pixels. Defendant advertises the screens of the iPhone XS and iPhone XS Max Products by using a color image of a planet, so that the black space left by missing pixels will blend in with the black background of the image. These images are used on Defendant's website[5] to compare the Products to other phones:




18.    Images   that disguise the missing pixels on the Products' screens are prominent on Defendant's website,[6,7] as well as in the advertisements of retailers who sell the Products. These images were relied on by Plaintiff DAVIS, who believed that the iPhone XS and XS Max would not have a notch at the top of the phone:

---

[5] https://www.apple.com/iphone/compare/ (Last accessed 9/25/18).
[6] https://www.apple.com/iphone-xs/ (Last accessed 9/20/18).
[7] https://www.apple.com/iphone-xs/display/ (Last accessed 9/20/18).





The missing pixels are imperceptible due to the black screen background

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT



19.     Plaintiffs bring this proposed consumer class action on behalf of themselves and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Products for consumption and not for resale in the United States, including all 50 states and the District of Columbia.

20.     During the Class Period, Defendant manufactured, marketed and sold the Products throughout the United States, including California. Defendant purposefully misrepresented, and continues to misrepresent, the screens of the Products.

21.     Defendant violates statutes enacted in each of the fifty states and the District of Columbia that are designed to protect consumers against false advertising and against unfair, deceptive, fraudulent, and unconscionable trade and business practices. These statutes include:

1.  Alabama Deceptive Trade Practices Act, Ala. Statues Ann. § 8-19-1, *et seq.*;
2.  Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;
3.  Arizona Consumer Fraud Act, Arizona Revised Statutes, § 44-1521, *et seq.*;
4.  Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;
5.  California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;
6.  Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;
7.  Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;
8.  Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;
9.  District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*;
10. Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;
11. Georgia Fair Business Practices Act, § 10-1-390 *et seq.*;
12. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480-1*, et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.*;
13. Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;
14. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

15. Indiana Deceptive Consumer Sales Act, Indiana Code Ann. § 24-5-0.5-0.1, *et seq.*;

16. Iowa Consumer Fraud Act, Iowa Code § 714.16, *et seq.*;

17. Kansas Consumer Protection Act, Kan. Stat. Ann § 50 626, *et seq.*;

18. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et seq.*;

19. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1401, *et seq.*;

20. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*;

21. Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.*;

22. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

23. Michigan Consumer Protection Act, § 445.901, *et seq.*;

24. Minnesota Prevention of Consumer Fraud Act, Minn. Stat § 325F.68, *et seq.*, and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

25. Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;

26. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

27. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et seq.*;

28. Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.*;

29. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*;

30. New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*;

31. New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*;

32. New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*;

33. New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.*, and New York False Advertising Law, N.Y. Gen. Bus. Law § 350, *et seq.*;

34. North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15-01, *et seq.*;

35. North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes § 75-1, *et seq.*;

36. Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. § 4165.01, *et seq.*;

37. Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;

38. Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.*;

39. Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § 201-1, *et seq.*;

40. Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

41. South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

42. South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws § 37-24-1*, et seq.*;

43. Tennessee Trade Practices Act, Tennessee Code Annotated § 47-25-101, *et seq.*;

44. Texas Stat. Ann. § 17.41, *et seq., *Texas Deceptive Trade Practices Act, *et seq.*;

45. Utah Unfair Practices Act, Utah Code Ann. § 13-5-1, *et seq.*;

46. Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.*;

47. Virginia Consumer Protection Act, Virginia Code Ann. § 59.1-196, *et seq.*;

48. Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.*;

49. West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;

50. Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*;

51. Wyoming Consumer Protection Act, Wyoming Stat. Ann. § 40-12-101, *et seq.*

22.    Defendant's marketing of its Products falsely inflates their screens' supposed pixel counts, resolutions, and sizes to make the Products seem more appealing to consumers. Defendant does so because screen resolution is an important factor to consumers when evaluating smartphones. Plaintiffs COURTNEY DAVIS, CHRISTIAN SPONCHIADO, and Class Members in all 50 states and the District of Columbia reasonably relied on Defendant's deceptive marketing campaign to purchase the Products when they would not have purchased them otherwise or would not have purchased them at their inflated purchase prices. Defendant has been unjustly enriched as a result of its unlawful conduct. Through these unfair and deceptive practices, Defendant has collected

millions of dollars from the sale of its Products. Plaintiffs bring this action to stop Defendant's deceptive practice.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). This is a putative class action whereby: (i) the proposed class consists of over 100 class members; (ii) at least some of the proposed class members have a different citizenship from Defendant; and (iii) the amount in controversy exceeds the sum of value of $5,000,000.00, excluding interest and costs.

24.     The Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

25.     The Court has jurisdiction over the state law claims because they form part of the same case or controversy under Article III of the United States Constitution.

26.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

27.     This Court has personal jurisdiction over Defendant because their Products are advertised, marketed, distributed, and sold throughout California State; Defendant engaged in the wrongdoing alleged in this Complaint throughout the United States, including in California State; Defendant is incorporated in and are authorized to do business in California; and Defendant has sufficient minimum contacts with California and/or otherwise have intentionally availed themselves of the markets in California, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial and not isolated activity within California State, and Defendant APPLE INC. is incorporated in California State.

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

District, the Defendant has caused harm to Class Members residing in this District, and the Plaintiff SPONCHIADO is a resident of this District under 28 U.S.C. 1391(c)(2) because it is subject to personal jurisdiction in this district.

<u>**PARTIES**</u>

*Plaintiffs*

29.    Plaintiff CHRISTIAN SPONCHIADO is a citizen of the State of California and resides in San Mateo County, California. In December 2017, Plaintiff CHRISTIAN SPONCHIADO was exposed to and saw Defendant's screen claims regarding the iPhone X Product in advertisements and online as part of Defendant's continuous marketing program. In reliance on the Product specifications as conveyed in Defendant's representations and in the product specifications sheet, Plaintiff CHRISTIAN SPONCHIADO purchased the 256 GB iPhone X Product for personal consumption at an AT&T store located in San Francisco. The retail purchase price was approximately $1,149 for his Product. Plaintiff CHRISTIAN SPONCHIADO purchased the Product believing it would provide the advertised screen quality, i.e. that it would have the advertised resolution as measured in pixels and that it would have the advertised size. Plaintiff CHRISTIAN SPONCHIADO used the Product as directed. The Product did not provide the advertised screen quality or resolution, however. As a result of his purchase, Plaintiff CHRISTIAN SPONCHIADO suffered injury in fact and lost money because the Product did not provide the advertised screen quality, resolution, or size and was worth less than the phone he had bargained for. Plaintiff intends to purchase Defendant's phone Products in the future and is concerned that Defendant's deception will lead him to pay an inflated price for them.

30.    Plaintiff COURTNEY DAVIS is a citizen of the State of New York and resides in Kings County, New York. In September 2018, Plaintiff COURTNEY DAVIS was exposed to and saw Defendant's screen claims regarding the iPhone XS Max in advertisements and online as part of Defendant's continuous marketing program. In early September, Plaintiff DAVIS visited the Apple Store located in Grand Central Station, New

York, NY, and submitted a pre-order for an iPhone XS Product based on Defendant's representations in the store and in the media. However, she ultimately determined that she desired a larger, better screen was worth the higher price of the iPhone XS Max, as she desired that Product's advertised screen size and resolution. In reliance on the Product specifications as conveyed in Defendant's representations that had been made in-person when she was in the Apple store and were repeated online, in the product specifications sheet, in advertisements, on or about September 29, 2018, Plaintiff COURTNEY DAVIS cancelled her iPhone XS pre-order and instead pre-ordered the 64 GB iPhone XS Max Product for personal consumption online in New York. The retail purchase price was approximately $1,099 for her Product. Plaintiff COURTNEY DAVIS purchased the Product believing it would provide the advertised screen quality, i.e. that it would have the advertised resolution as measured in pixels and that it would have the advertised size. Plaintiff COURTNEY DAVIS used the Product as directed. The Product did not provide the advertised screen quality or resolution, however. As a result of her purchase, Plaintiff COURTNEY DAVIS suffered injury in fact and lost money because the Product did not provide the advertised screen quality, resolution, or size and was worth less than the phone she had bargained for.

*Defendant*

31.    Defendant Apple Inc. ("Defendant") is a California corporation with its principal place of business located at 1 Infinite Loop, Cupertino, CA 95014.

## FACTUAL ALLEGATIONS

### Pixel Structure

32.    Smartphones are devices that rely on their digital display to communicate information to the user. Tiny units on the display screen (pixels) individually display a full range of colors, brightness, and shades, and these pixels combine to make up an image. Screen display size and image quality are determined by the number of pixels available in

the display. For any screen size, an increased density of pixels, with more pixels in the same amount of space, results in a higher quality image.

33. Every pixel on a screen is made of several smaller subpixels. Each subpixel can output exactly one color. When combined, subpixels form a "pixel" that can take on a wide range of colors and brightness. A pixel does this by lighting up different combinations of its sub pixels in different intensities. Traditionally, a pixel is made up of three subpixels: Red (R), Green (G), & Blue (B). Because these three colors are the primary colors, they can be combined make other colors. For example: Red and Green light combine to make Yellow light; Green and Blue light combine to make Cyan light; and Red and Blue light combine to make Magenta light. Red, Green, and Blue light can combine to make White light. See the images below for reference:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   34.   By changing the brightness of each subpixel, the overall pixel is able to
18   display the full range of color with varying brightness and shades. See the color wheel
19   below, illustrating the spectrum of color possible using different intensities of different
20   combinations of Red, Blue, and Green light:
21
22
23
24
25
26
27
28

35.     This occurs because the three subpixels' color combines into a single color for the pixel. These subpixels are typically lined up on the screen in the following order: RGB_RGB_RGB_RGB-…, etc., with each RGB combination representing one pixel.[8]

36.     Each pixel is only lit up by its subpixels. If all of a pixel's subpixels are off, the pixel remains black because no subpixel (or combination of subpixels) is on.

37.     True screen pixels have at least one red subpixel, one blue subpixel, and one green subpixel, grouped together.

**Defendant's Screen Is Deceptively Advertised as Having More Pixels Than It Really Has**

38.     Defendant manufactures, distributes, markets, and sells phones nationwide, including the Products. The Products are marketed as possessing higher pixel resolution screens than they really have. Since launching the Products, Defendant has consistently

---

[8] It is also possible to align the red, blue, and green subpixels in a different order within a pixel. So long as each pixel contains at least one of each red, green, and blue subpixel, it will be fully capable of making every color. For example, in the Google Nexus 4, the blue subpixel is first, such that the layout is "BGR".

conveyed its uniform deceptive message to consumers throughout the United States, including California. False statements about the Products were directly released by Defendant online and repeated at point of sale. See image below, showing Defendant's false online resolution statement regarding the iPhone X Product:



39.     The Products' screens omit half of the red and half of the blue subpixels in a display. Therefore, they have half of the advertised number of pixels and two thirds of the advertised number of subpixels. For example, where a traditional screen would have four pixels (and 12 subpixels, 4 of each primary color), Defendant removes every other red subpixel and every other blue subpixel, resulting in hardware with 8 subpixels (4 green, 2 red, and 2 blue) that is only capable of forming two true pixels (because there are only two red and two blue subpixels, and a true pixel needs at least one red, blue, and green subpixel).

40.     On the Product's screen, false pixels share fractions of neighboring red and blue subpixels as shown below, with each red and blue subpixel divided into quarters, and each false pixel containing two quarters of blue subpixels and two quarters of red subpixels. Below is an image showing six false pixels, as Defendant defines them:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



41.     Each false pixel contains one green subpixel, two quarters of red subpixels, and two quarters of blue subpixels. There are only half of the necessary number of red and blue subpixels.

42.     This means that the Products' false pixels cannot all freely make any color because each false pixel is unable to freely use the red and blue subpixels it shares with the adjacent false pixel. For example, if an image requires a blue pixel next to a red pixel, the image will be blurry because those two false pixels share red and blue subpixels. To make a blue pixel, red subpixels must be off and the blue subpixels must be on, whereas to make a red pixel, the red subpixels must be on and the blue subpixels must be off. It is impossible for the two adjacent false pixels to make a display of one red pixel and one blue pixel because they share subpixels, as shown above.

43.     Due to being based on fake pixels, the Products' screens omit half of the red and half of the blue subpixels in a display. Therefore, it has half of the advertised number of pixels and two thirds of the advertised number of subpixels. For example, where a traditional screen would have 16 pixels (and 48 subpixels), Defendant removes every other red subpixel and every other blue subpixel, resulting in only two real pixels (and 8 subpixels).

44.     The below diagrams show how Defendant abuses the concept of a pixel. The first grid consists of 36 subpixels, which comprise true 12 pixels, with each pixel possessing a red subpixel, a green subpixel, and a blue subpixel. The second grid shows how these are grouped into 12 true pixels:



Figure 1                                    Figure 2

45.     The third grid shows the 24 subpixels Defendant includes in its 12 false pixels.[9] The fourth grid shows that the hardware can only physically comprise six true pixels (containing at least one red, one blue, and one green subpixel) at most:



Figure 3



Figure 4

46.     So, for every 12 red subpixels in a traditional screen, Defendant provides only 6 red subpixels. For every 12 blue subpixels in a traditional screen, Defendant provides only 6 blue subpixels. For every 12 green subpixels in a traditional screen, Defendant provides the appropriate 12 subpixels. So, in total, for every 36 subpixels in a traditional screen, Defendant provides only 24 subpixels. The result of omitting the red subpixels and blue subpixels from the screen that only six true pixels' worth of subpixels remain. Where a Product has six true pixels' worth of subpixels, Defendant misrepresents that the Product has twelve pixels. Defendant makes this same misrepresentation for the Product— regardless of its true pixel count, it is misrepresented as having more pixels than it really does.

_____

[9] The display layout tilts the square grid 45 degrees into a diamond grid.

47.    Correspondingly, the iPhone X Product's "2436×1125" screens should have 2,740,500 total pixels (2436×1125 = 2,740,500) and at least three subpixels in each pixel, i.e. 8,221,500 total subpixels (2,740,500 red subpixels, 2,740,500 green subpixels, and 2,740,500 blue subpixels). However, the screens actually have about half the appropriate number of red and blue subpixels, and therefore could only make about half the number of true pixels.

48.    Defendant does not provide extra green subpixels to consumers – it merely provides the correct number of green subpixels, but no more, and it only includes half of the promised number of red and blue subpixels. Defendant reduces its production costs by leaving out half of the blue and half of the red subpixels.

49.    Even though Defendant's screens could only make one real pixel for every four subpixels, Defendant advertises them as having one pixel for every two subpixels. It justifies this by counting red and blue subpixels as "shared" by pixels, splitting the subpixels into quarters between pixels. The shared subpixels are generally not able to simultaneously be the appropriate brightness for all of the false pixels they are shared between.

50.    In other words, Defendant is misleading reasonable consumers to believe that its Product screens provide the same clarity as would RGB screens of the advertised resolution. A pixel traditionally has three subpixels—red, blue and green—and can therefore make any color, with every adjacent pixel also able to simultaneously make any color. The Product screens possess about 50% fewer red subpixels and about 50% fewer blue subpixels than advertised. The Product screens only have enough red subpixels and blue subpixels to comprise half of the advertised number of pixels.

**Defendant's Method of Counting Pixels is Unjustified and Not Anticipatable by a Reasonable Consumer**

51.    A real pixel consists of a red subpixel, a green subpixel, and a blue subpixel. Apple counts as a "pixel" each unit of two quarters of a red subpixel, one green subpixel,

and two quarters of a blue subpixel. The absurdity of Defendant's method of counting fractions of subpixels as pixels is made apparent by applying an analogous method to a standard RGB pixelated screen. It is trivially easy to draw imaginary boxes around portions of subpixels to arrive at a higher pixel count. Below is a diagram of nine subpixels combined to form three pixels:



52.     Below, those same subpixels are arbitrarily subdivided to form seven false pixels. Each false pixel is uniquely comprised of portions of red, green, and blue subpixels:



53.     Such a subdivision would be wholly misleading, and that is precisely the type of deception practiced by Defendant. What consumers reasonably expect when they see an advertised screen resolution denoted in pixels is that the screens in question have that many **<u>actual</u>** pixels, with each pixel able to create the full range of colors, not that some fanciful drawing of boxes could enclose fractions of each type of subpixel.

54.     Defendant advertises a screen resolution that is higher in quality then what is actually delivered. This misleads consumers into overpaying for phones that offer worse quality than what those consumers reasonably expect to receive.

**The Products Are Missing Additional Pixels and Subpixels Because the Products'**
**Screens Have Rounded Corners**

55.    The Products are all advertised as possessing a full grid of pixels, with a certain number of pixels width and a certain number of pixels in height. For example, the iPhone X Product is advertised as having a 2436×1125 screen, which should be 2436 pixels tall and 1125 pixels wide, with 2,740,500 total pixels and 8,221,500 total subpixels (2,740,500 red subpixels, 2,740,500 green subpixels, and 2,740,500 blue subpixels). The 2436×1125 representation overstates the size of the screen for two reasons. First, the pixels in the Products are false pixels. Secondly, even if Defendant's false pixels were true pixels, the 2436×1125 representation would not be true. In reality, the screen is smaller because it is 2436 pixels tall **only at its tallest point** and 1125 pixels wide **only at its widest point**. The corners are rounded and there is a notch at the top of the phone where pixels are missing. See below:

CLASS ACTION COMPLAINT



**CLASS ACTION COMPLAINT**

1

**Defendant's Pixel Count Claims Are False and Misleading**

2

3      56.     Throughout its advertising of the Products, including online product

4  descriptions, promotional material, and Products' packaging and labels, Defendant has

5  consistently conveyed the very specific message to consumers that the Products have high

6  resolutions and large screen sizes, with the advertised number of pixels and subpixels. The

7  implication is clear: the Products possess a pixel count calculated just as its other phones'

8  pixels are calculated, with each pixel being a true pixel capable of producing every color.

9  This means that Defendant effectively claims that the Products possess a higher pixel count

10 than they really do. Defendant consequently claims that the Products have a higher screen

11 quality than it really has, with about 33% more subpixels than the phones really have. The

12 whole concept of the advertised screen resolution and size is hinged upon this deception.

13     57.     The Products' advertising and packaging advertises pixel resolutions of

14 particular widths times particular heights, implying that the pixel counts will be the product

15 of those numbers, and so accordingly the subpixel count will be about three times the

16 number of pixels, with three subpixels per pixel. For example, the iPhone X Product is

17 advertised as having a $1125 \times 2436$ screen, which should be 1,125 pixels wide and 2,436

18 pixels tall, with 2,740,500 total pixels and 8,221,500 total subpixels (2,740,500 red

19 subpixels, 2,740,500 green subpixels, and 2,740,500 blue subpixels). In reality, the screen

20 has only about 1,370,250 red subpixels, 2,740,500 green subpixels, and 1,370,250 blue

21 subpixels, for a total of about 5,481,000 subpixels.

22     58.     The Products only have half the advertised amount of red and blue subpixels,

23 and so the Products' screens could—at most—only form half of the advertised number of

24 true pixels. The subpixel count in the Products is about 33% lower than what the reasonable

25 consumer expects, causing degraded screen qualities. This means that the reasonable

26 consumer is being misled into purchasing a product with a lower pixel and subpixel count

27 than expected.

1    59.    This method of advertising is deceptive and misleading to the reasonable

2    consumer.

3    60.    In addition to the Products' packaging, labeling, and specification sheets,

4    which consumers who purchased the Products in a physical store cannot miss, Defendant

5    made and repeated their false inflated pixel count across a variety of media. This includes

6    the product pages of large online stores such as www.amazon.com, where the Products can

7    be directly ordered, all specifically designed to reinforce the same false and misleading

8    claims. For example, CHRISTIAN SPONCHIADO's iPhone X Product is advertised on

9    amazon.com to have 2436×1125 resolution (i.e. 2,740,500 total pixels). It does not. See

10   partial screenshot below (emphasis added):[10]

---

[10] https://www.amazon.com/Apple-iPhone-GSM-Unlocked-5-8/dp/B075QNGDZL (Last accessed Aug. 10, 2018).

|  | iPhone X | iPhone 8 Plus | iPhone 8 |
|---|---|---|---|
| Screen | 5.8" all-screen OLED | 5.5" widescreen LCD | 4.7" widescreen LCD |
| Display | Super Retina HD display | Retina HD display | Retina HD display |
| Screen resolution | 2436x1125 at 458ppi | 1920x1080 at 401ppi | 1334x750 at 326ppi |

61.     Defendant's display method of adding extra green subpixels to display images **<u>might</u>** have merit as a way to design screens for human perception. Many high-end screens add subpixels to each pixel, using RGBW or RGBY pixels on their screens, with an extra, fourth subpixel per pixel in addition to the base RGB subpixels. Such screens have an extra subpixel added to each basic RGB pixel, and these screens therefore have four subpixels per pixel. So, Defendant is free to produce screens with extra green subpixels and market them as having extra green subpixels, so long as it provides a true and correct pixel count, with at least one red subpixel, one green subpixel, and one blue subpixel per pixel.

62.     However, Defendant does not group subpixels this way. Even though the Products have enough red and blue subpixels to constitute half of the advertised number of

true pixels, the Products use no true pixels. Instead, they only use false pixels, producing an inferior image quality.

63.     Defendant is also free to continue to produce the Products' screens and market them without listing an explicit or implied pixel count. Defendant could price and advertise such screens as being far cheaper than higher-quality conventional RGB screens with the same number of green subpixels. But Defendant's promise of a certain resolution is reasonably understood by ordinary consumers to mean that the screens have at least one red subpixel, one green subpixel, and one blue subpixel per pixel. Defendant fails to deliver on this promise. Defendant's Products' screens are all falsely advertised, and Defendant's advertisements mislead reasonable consumers.

64.     All of Defendant's phones other than the Products have true pixels; however, the Products use false pixels.[11] Defendant misleads consumers by directly comparing the Products' screen resolution to the resolution of other iPhones, as if they both used true pixels:

---

[11] All of Defendant's other phones (and the iPhone XR Product) use LCD technology, whereas the Products (except for the iPhone XR Product) use OLED technology for their subpixels. The Apple Watch uses OLED technology and its pixels are all true pixels comprised of one red, one blue, and one green subpixel. https://support.apple.com/kb/sp766?locale=en_US (Last accessed 8/24/18).



**The Impact of Defendant's Misleading and Deceptive Advertising**

65.    Defendant has succeeded in its deceit and has reaped monetary benefits from its deceptive campaigns advertising the Products. Such profit would not have occurred without Defendant's deceptive and misleading marketing and advertising campaign because consumers would have purchased other, similar phones that were truthfully advertised with the accurate number of pixels and subpixels.

66.     Defendant charges a price of up to about $1,449 for the Products, despite the false pixel count implied through its advertising. Plaintiffs and the other members of the Classes paid the price for the Products because they didn't know that Defendant's claims about them were false and misleading.

67.     Plaintiffs and the other members of the Classes each believed they were purchasing a Product that would provide the implied pixel resolution as detailed herein, with the advertised number of pixels per inch of screen. In reality, Plaintiffs and the other members of the Classes paid to receive the missing pixels and approximately 33% missing subpixels, but they did not get what they bargained for.

68.     As a result of Defendant's deceptive marketing and lack of proper labels, Plaintiffs and the Class Members have been harmed in their purchases of the Products.

69.     As the manufacturers, sellers, and/or distributors of the Products, Defendant possesses specialized knowledge regarding the make-up and screen quality of the Products.

70.     Defendant knew or should have known, but failed to disclose, that the Product does not provide the pixel or subpixel count promised through advertisements.

71.     As a result of Defendant's deceptive pixel claim, Plaintiffs and other members of the proposed Classes have purchased the Product which does not perform as advertised. Defendant has reaped enormous profits from its false, misleading and deceptive marketing and sale of the Products. Plaintiffs and members of the proposed Classes have been deceived and misled by Defendant's deceptive pixel resolution claim.

## CLASS ACTION ALLEGATIONS

72.     Plaintiffs seek relief in her individual capacity and as representative of all others who are similarly situated. Pursuant to Rule 23(a), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following classes:

1

**The Nationwide Class**

2

      73.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

3

Rules of Civil Procedure on behalf of the following class (the "Nationwide Class"):

4

> All retail consumers who purchased or financed the Product in the United
> States, including all 50 states and the District of Columbia, during the
> applicable statute of limitations period and/or such subclasses as the Court
> may deem appropriate, until the date of notice is disseminated.

5

6

7

      74.    California law applies to the claims of all U.S. purchasers. In the alternative,

8

if the Court finds that California law does not apply to all members of the Nationwide

9

Class, Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

10

of Civil Procedure on behalf of the Nationwide Class and State Subclasses. Each State

11

Subclass consists of:

12

> All retail consumers who purchased or financed the Product in that state
> within the applicable statute of limitations period, and/or such subclasses as
> the Court may deem appropriate, until the date of notice is disseminated.

13

14

**The California Class**

15

16

      75.    In the alternative, should a Nationwide Class under California law not be

17

certified, Plaintiff CHRISTIAN SPONCHIADO seeks to represent the following Class or

Subclass (the "California Class"):

18

> All retail consumers who purchased or financed the Product in California
> within the applicable statute of limitations period, and/or such subclasses as
> the Court may deem appropriate, until the date of notice is disseminated.

19

20

21

**The New York Class**

22

      76.    Also in the alternative, should a Nationwide Class under California law not

23

be certified, Plaintiff COURTNEY DAVIS seeks to represent the following Class or

24

Subclass (the "New York Class"):

25

> All retail consumers who purchased or financed the Product in New York
> within the applicable statute of limitations period, and/or such subclasses as
> the Court may deem appropriate, until the date of notice is disseminated.

26

27

28

77.     Excluded from the Classes (Collectively the Nationwide Class and the state Class comprise the "Classes") are Defendant's current and former officers, directors, and employees, and those who purchased the Product for the purpose of resale. Also excluded from the Class is the judicial officer to whom this lawsuit is assigned.

78.     Plaintiffs reserve the right to revise the Class definitions based on facts learned in the course of litigating this matter.

79.     ***Numerosity***. While the exact number and identities of purchasers of the Product are unknown to Plaintiffs at this time, Plaintiffs are informed and believe that the Nationwide Class, California Class, and New York Class contain thousands of purchasers ("Class Members") and are so numerous that individual joinder of all Class Members is impracticable.

80.     In the alternative, if the Court finds that California law does not apply to all members of the Nationwide Class, Plaintiffs are informed and believe each State Subclass contains thousands of purchasers ("Class Members") and are so numerous that individual joinder of all Class Members is impracticable.

81.     ***Existence and Predominance of Common Questions of Law and Fact***. Common questions of law and fact arise from Defendant's conduct described herein. Such questions are common to all Class Members and predominate over any questions affecting only individual Class Members and include:

   a.   Whether the claims discussed above are true, or are misleading, or objectively likely to deceive;

   b.   Whether Defendant's marketing and advertising of the Product is false, fraudulent, deceptive, unlawful, or misleading;

   c.   Whether Defendant has breached warranties made to the consuming public about their Product;

   d.   Whether Defendant's marketing, promotion, advertising and sale of the Product is and was a deceptive act or practice in the conduct of business

directed at consumers, giving rise to consumer law violations in all other jurisdictions;

e.  Whether Plaintiffs and members of the Classes sustained monetary loss and the proper measure of loss;

f.  Whether Defendant's conduct constitutes unjust enrichment, and whether equity calls for disgorgement of unjustly obtained or retained funds, restitution to, or other remedies for the benefit of the Classes;

g.  Whether Plaintiffs and other members of the Classes are entitled to other appropriate remedies, including equitable relief; and

h.  Whether Defendant's conduct rises to the level of reprehensibility under applicable law such that the imposition of punitive damages is necessary and appropriate to fulfill the societal interest in punishment and deterrence, and the amount of such damages and/or their ratio to the actual or potential harm to the Class.

82.  In the alternative, if the Court finds that California law does not apply to all members of the Nationwide Class, consumer fraud laws among the 50 states and the District of Columbia are substantially uniform in their treatment of Defendant's deceptive practices such that a realistic plan exists for adjudicating the claims of the Nationwide Class under each state's laws.

83.  *Typicality*. Plaintiffs' claims are typical of those of the Class Members because, *inter alia*, Plaintiffs and the other Class Members were all injured by same uniform conduct, as detailed herein, and were subject to Defendant's pixel claims that accompanied each and every Product. In addition, nowhere did product advertising clearly warn consumers about the Product's true subpixel count or screen size. Plaintiffs are advancing the same claims and legal theories on behalf of herself and all members of the Classes.

84.  *Adequacy of Representation*. Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained competent counsel experienced

in prosecuting nationwide class actions. Plaintiffs understand the nature of their claims herein, have no disqualifying conditions, and will vigorously represent the interests of the Classes and/or State Subclasses. Neither Plaintiffs nor Plaintiffs' counsel has any interests that conflict with or are antagonistic to the interests of the Classes or State Subclasses.

85. *Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by any individual Class Member is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. Thus, it would not be economically feasible for an individual Class Member to prosecute a separate action on an individual basis, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

86. The prerequisites to maintaining a class action for equitable relief pursuant to Rule 23(b)(2) are also met, as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

87. In the alternative, if the Court finds that California law does not apply to all members of the Nationwide Class, a Nationwide Class applying the laws of individual states is superior to other methods of resolving this controversy. Individual states' consumer fraud law has little substantive variation as applied to this case. To the extent that state laws vary, "relatively minor variations . . . may be handled at trial 'by grouping similar state laws together and applying them as a unit.'" *In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010) (*quoting In re Prudential Ins. Co. Am. Sales Prac. Litig.*, 148 F.3d 283, 315 (3d Cir. 1998)).

88. Plaintiffs seek preliminary and permanent equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent

Defendant from engaging in the acts described, and requiring Defendant to provide full restitution to Plaintiffs and Class Members.

89.     Unless a Class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiffs and Class Members.

## CAUSES OF ACTION

## COUNT I.

## VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, (Cal. Civ. Code § 1750, *et seq.*)

*(Brought Individually and on behalf of the Nationwide Class under California Law;*
*Alternatively, brought Individually and on behalf of the California Class)*

90.     Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

91.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class for an injunction, restitution, and damages for Defendant's violations of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, including section 1761(d).

92.     Alternatively, Plaintiff CHRISTIAN SPONCHIADO brings this claim individually and on behalf of the California Class for an injunction, restitution, and damages for Defendant's violations of the CLRA.

93.     Plaintiffs and Class Members are consumers who purchased or leased the Products for personal, family or household purposes. Plaintiffs and Class Members are "consumers" as that term is defined by the CLRA. Cal. Civ. Code § 1761(d). Plaintiffs and Class Members are not sophisticated experts with independent knowledge of either (a) optical engineering, or (b) corporate branding, labeling and packaging practices.

94.     Phones that Plaintiffs and other members of the Classes purchased from Defendant were "goods" within the meaning of the CLRA. Cal. Civ. Code § 1761(a).

95.     Defendant's actions, representations, and conduct have violated and continue to violate the CLRA, because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers.

96.     Defendant violated federal and California law because the Products are falsely advertised and because they are intentionally packaged to mislead consumers and to prevent the consumer from being able to determine that they are falsely advertised.

97.     California's Consumers Legal Remedies Act prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have." Cal. Civ. Code § 1770(a)(5). By engaging in the conduct set forth herein, Defendant violated and continues to violate section 1770(a)(5) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendant misrepresents that the Products have quantities of pixels and subpixels that they do not have, and screen sizes that they do not have.

98.     The CLRA further prohibits "[a]dvertising goods or services with intent not to sell them as advertised." Cal. Civ. Code § 1770(a)(9). By engaging in the conduct set forth herein, Defendant violated and continue to violate section 1770(a)(9), because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it advertises goods with the intent not to sell the goods as advertised. Defendant instead sells cell phones (the "Products") with worse screens than advertised.

99.     Plaintiffs and Class Members acted reasonably when they purchased the Products based on their belief that Defendant's representations were true and lawful.

100.    Plaintiffs and members of the Classes suffered injuries caused by Defendant because (a) they would not have purchased the Products on the same terms absent Defendant's illegal and misleading conduct as set forth herein; (b) they paid a price

premium for the Products due to Defendant's misrepresentations and deceptive packaging; and (c) the Products did not have the qualities as promised.

101.   On or about October 5, 2018, prior to filing this action, a CLRA notice letter was served on Defendant which complies in all respects with California Civil Code section 1782(a). Plaintiffs sent to Defendant, on behalf of himself and the proposed Nationwide Class and California Class, a letter via certified mail, return receipt requested, advising Defendant that it is in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. A true and correct copy of Plaintiffs' letter is attached hereto as **Exhibit A**.

102.   Wherefore, Plaintiffs seeks damages, restitution, and injunctive relief for these violations of the CLRA.

## COUNT II.

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, (California Business & Professions Code § 17200, *et seq.*)

*(Brought Individually and on behalf of the Nationwide Class under California Law; Alternatively, brought Individually and on behalf of the California Class)*

103.   Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

104.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class for an injunction and damages for Defendant's violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

105.   Alternatively, Plaintiff CHRISTIAN SPONCHIADO brings this claim individually and on behalf of the California Class for an injunction and damages for Defendant's violations of the UCL.

106.   The UCL provides, in pertinent part: "[U]nfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ." Cal. Bus. & Prof. Code § 17200.

107.   Defendant violated federal and California law because the Products are falsely advertised and because they are intentionally packaged to mislead consumers and prevent the consumer from being able to determine that they are falsely advertised.

108.   Defendant's business practices, described herein, violated the "unlawful" prong of the UCL by violating the CLRA, and other applicable law as described herein.

109.   Defendant's business practices, described herein, violated the "unfair" prong of the UCL in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits. Defendant's advertising is of no benefit to consumers, and its false assertions and omissions concerning the screen quality and pixel and subpixel count of the Product offends public policy.

110.   Defendant violated the "fraudulent" prong of the UCL by misleading Plaintiffs and members of the Classes to believe that the Products contained more pixels and subpixels than they actually do—i.e. that they have a higher-quality screen than they actually have—and that such packaging and labeling practices were lawful, true and not intended to deceive or mislead the consumers.

111.   Plaintiffs and members of the Classes are not sophisticated experts about the corporate branding, labeling, and packaging practices of the Products. Plaintiffs and members of the Classes acted reasonably when they purchased the Products based on their belief that Defendant's representations were true and lawful.

112.   Plaintiffs and members of the Classes lost money or property as a result of Defendant's UCL violations because (a) they would not have purchased their purchased Products on the same terms absent Defendant's illegal conduct as set forth herein, or if the true facts were known concerning Defendant's representations; (b) they paid a price premium for the Products due to Defendant's misrepresentations; and (c) the Products did not have the qualities as promised.

## COUNT III.

### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW, (California Business & Professions Code § 17500, *et seq.*)

*(Brought Individually and on behalf of the Nationwide Class under California Law; Alternatively, brought Individually and on behalf of the California Class)*

113.   Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

114.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class for an injunction and damages for Defendant's violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

115.   Alternatively, CHRISTIAN SPONCHIADO brings this claim individually and on behalf of the California Class for an injunction and damages for Defendant's violations of the FAL.

116.   By enacting the FAL, the State of California has made it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." Cal. Bus. & Prof. Code § 17500.

117.   Defendant engaged in a scheme of offering misbranded Products for sale to Plaintiffs and members of the Classes by way of packaging the Products with inferior screens containing less than the advertised number of pixels and subpixels. Such practice misrepresented the content, screen size, screen quality, and pixel and subpixel quantity of the misbranded Products. Defendant's advertisements and inducements were made in California and come within the definition of advertising as contained in the FAL, in that the Products' packaging was intended as inducements to purchase Defendant's Products. *See* Cal. Bus. & Prof. Code § 17500, *et seq.* Defendant knew that these statements were unauthorized, inaccurate, and misleading.

118.   Defendant violated federal and California law because the Products are falsely advertised and because they are intentionally packaged to mislead consumers and prevent the consumer from being able to determine that it is falsely advertised.

119.   Defendant violated the FAL by misleading Plaintiffs and the members of the Classes to believe that the advertised representations about pixel and subpixel count and screen size constituted true representations about the Products as described herein.

120.   Defendant knew or should have known, through the exercise of reasonable care, that the Products were and continue to be misbranded, and that its representations about the Products' (a) screen size, (b) screen quality, and (c) pixel and subpixel count were untrue and misleading.

121.   Plaintiffs and the members of the Classes lost money or property as a result of Defendant's FAL violations because (a) they would not have purchased their purchased Products on the same terms absent Defendant's illegal conduct as set forth herein, or if the true facts were known concerning Defendant's representations; (b) they paid a price premium for the Products due to Defendant's misrepresentations; and (c) the Products did not have the characteristics, benefits, or qualities as promised.

## COUNT IV.

### VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES ACT
### (N.Y. Gen. Bus. Law § 349, *et seq.*)

*(Alternatively, brought Individually and on behalf of the New York Class.)*

122.   Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

123.   Plaintiff brings this claim individually and on behalf of the Nationwide Class for an injunction and damages for Defendant's violations of.

124.   In the alternative, COURTNEY DAVIS brings this claim individually and on behalf of the New York Class for an injunction and damages for Defendant's violations of New York's Deceptive Acts and Practices Law, Gen. Bus. Law ("NY GBL § 349").

125.   Defendant's business acts and practices and/or omissions alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

126.   The practices of Defendant described throughout this Complaint, were specifically directed to consumers and violate the NY GBL § 349 for, inter alia, one or more of the following reasons:

a.   Defendant engaged in deceptive, unfair and unconscionable commercial practices in failing to reveal material facts and information about the Product, which did, or tended to, mislead Plaintiff COURTNEY DAVIS and the Class about facts that could not reasonably be known by them;

b.   Defendant failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

c.   Defendant caused Plaintiff COURTNEY DAVIS and the Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through their conduct;

d.   Defendant failed to reveal material facts to Plaintiff COURTNEY DAVIS and the Class with the intent that Plaintiff COURTNEY DAVIS and the Class Members rely upon the omission;

e.   Defendant made material representations and statements of fact to Plaintiff COURTNEY DAVIS and the Class that resulted in Plaintiff COURTNEY DAVIS and the Class reasonably believing the represented or suggested state of affairs to be other than what they actually were;

f.   Defendant intended that Plaintiff COURTNEY DAVIS and the members of the Class rely on their misrepresentations and omissions, so that Plaintiff COURTNEY DAVIS and Class members would purchase the Products; and

g.   Defendant knowingly and falsely represented and advertised that the Products have an inflated pixel resolution.

127.   Under all of the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices were malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

128.   Defendant's actions impact the public interest because Plaintiff COURTNEY DAVIS and members of the Class were injured in exactly the same way as thousands of others purchasing the Product as a result of and pursuant to Defendant's generalized course of deception.

129.   By committing the acts alleged in this Complaint, Defendant has extracted a high price from Plaintiff COURTNEY DAVIS and the Class by inducing an erroneous belief that the Products have higher quality screens than they really do, with more pixels and subpixels than they really have. This is a deceptive business practice that violates NY GBL § 349.

130.   Defendant's pixel claims misled Plaintiff COURTNEY DAVIS, and they are likely to mislead other reasonable consumers in the future. Specifically, as a result of Defendant's false advertising, Plaintiff COURTNEY DAVIS and other Class members suffered monetary losses associated with the purchase of the Products because they possess inferior screens with smaller size, lower quality, and lower pixel and subpixel count than advertised. The Products were consequently worth far less than what Plaintiff COURTNEY DAVIS and Class Members had bargained for.

131.   The foregoing deceptive acts, omissions and practices were directed at consumers.

132.   The foregoing deceptive acts, omissions and practices set forth in connection with Defendant's violations of NY GBL § 349 proximately caused Plaintiff COURTNEY DAVIS and other members of the Class to suffer actual damages in the form of, inter alia, monies spent to purchase the Products, and are entitled to recover such damages, injunctive relief, together with equitable and declaratory relief, appropriate damages, including punitive damages, attorneys' fees and costs.

## COUNT V.

## VIOLATIONS OF THE NEW YORK FALSE ADVERTISING LAW
### (N.Y. Gen. Bus. Law § 350, *et seq.*)

*(Alternatively, brought Individually and on behalf of the New York Class.)*

133.   Plaintiff realleges and incorporates herein by reference all allegations contained above as if fully set forth herein and further allege as follows:

134.   Plaintiff brings this claim individually and on behalf of the Nationwide Class for violations of New York's False Advertising Law, Gen. Bus. Law ("NY GBL § 350").

135.   Alternatively, COURTNEY DAVIS brings this claim individually and on behalf of the New York Class for violations of NY GBL § 350.

136.   NY GBL § 350 provides that false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state are unlawful.

137.   NY GBL § 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect."

138.   Any person who has been injured by reason of any violation of the NY GBL may bring an action in his own name to enjoin unlawful act or practice, an action to recover his actual damages or five hundred dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to ten thousand dollars, if the court finds the Defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

139.   As fully alleged above, by advertising, marketing, distributing, labeling and selling mislabeled Products utilizing lower quality screens than advertised to Plaintiff COURTNEY DAVIS and other members of the Class, Defendant engaged in, and continues to engage in, false advertising.

140.   Defendant engaged in false advertising by advertising, marketing, distributing and selling the Products with false pixels as if they possessed a higher pixel count than they

have, when Defendant knew that the Products were missing 33% of the subpixels advertised.

141.    Defendant's conduct was directed at consumers.

142.    Justifiable reliance is not required for a § 350 claim. See *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012).

143.    Plaintiff COURTNEY DAVIS and other members of the Class further seek to enjoin such unlawful deceptive acts and practices as described above. Each of the members of the Class will be irreparably harmed unless Defendant is enjoined from falsely advertising its Products with inflated pixel counts as described herein.

144.    Plaintiff COURTNEY DAVIS and other members of the Class suffered a loss as a result of Defendant's false advertising. Specifically, as a result of Defendant's false advertising, Plaintiff COURTNEY DAVIS and other Class members suffered monetary losses associated with the purchase or lease of the Products because the Products were less valuable than advertised.

145.    In this regard, Defendant has violated, and continues to violate, NY GBL § 350, which makes false advertising unlawful. As a direct and proximate result of Defendant's violation of NY GBL § 350 above, Plaintiff COURTNEY DAVIS and other members of the Class have suffered damages in an amount to be determined at trial.

## COUNT VI.

### UNJUST ENRICHMENT

***(Brought Individually and on Behalf of the Classes and/or Subclasses Under the Substantially Similar Unjust Enrichment Law of the 50 States and the District of Colombia)***

146.    Plaintiffs reallege and incorporates herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

147.    By purchasing the Products, Plaintiffs and members of the Classes conferred benefits on Defendant in the form of the purchase prices of their purchased Products.

148.    Defendant had knowledge of these benefits, and Defendant actively induced these benefits by means of their fraudulent and misleading representations and omissions.

149.   Defendant's acceptance and retention of these benefits is inequitable and unjust because the benefits were obtained through fraudulent conduct.

150.   Equity cannot in good conscience permit Defendant to be economically enriched for such fraudulent conduct at Plaintiffs' and Class Members' expense.

151.   Plaintiffs and Class Members therefore are entitled to restitution and/or disgorgement of Defendant's economic enrichment that it fraudulently obtained at Plaintiffs' and Class Members' expense.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, seek judgment against Defendant, as follows:

a.  An Order that this action be maintained as a class action and appointing Plaintiffs as representative of the Class;

b.  An Order appointing the undersigned attorneys as class counsel in this action;

c.  Awarding restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to Plaintiffs and the proposed Class Members;

d.  Awarding declaratory relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of their conduct and pay them all money it is required to pay;

e.  Statutory pre-judgment and post-judgment interest on any amounts;

f.  Awarding attorneys' fees and costs; and

g.  Such other relief as the Court may deem just and proper.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of himself and the Classes, demand a trial by jury on all questions of fact raised by the Complaint.

Dated this 14th day of December, 2018.

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**

By: _/s/  David Makman, Esq._          _

C.K. Lee *to be admitted pro hac vice*
**LEE LITIGATION GROUP, PLLC**
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
Email: cklee@leelitigation.com

David Makman, Esq.
CA Bar No.: 178195
**LAW OFFICES OF DAVID A. MAKMAN**
655 Mariner's Island, Suite 306
San Mateo, CA 94404
Tel: 650-242-1560
Fax: 650-242-1547
Email: david@makmanlaw.com

*Attorneys for Plaintiffs*
*and the Proposed Class*