C.K. Lee, *admitted pro hac vice*
**LEE LITIGATION GROUP, PLLC**
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
Email: cklee@leelitigation.com

David Alan Makman, Esq.
CA Bar No.: 178195
**LAW OFFICES OF DAVID A. MAKMAN**
655 Mariner's Island, Suite 306
San Mateo, CA 94404
Tel: 650-242-1560
Fax: 650-242-1547
Email: david@makmanlaw.com

*Attorneys for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN SPONCHIADO and COURTNEY DAVIS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No.:  4:18-cv-07533-HSG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs CHRISTIAN SPONCHIADO and COURTNEY DAVIS, (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated, by and through their undersigned attorneys, hereby file this First Amended Class Action Complaint against

Defendant, APPLE INC ("Apple" or "Defendant") and state as follows based upon their own personal knowledge and the investigation of their counsel:

## NATURE OF THE ACTION

1. Apple advertises its phones by touting their display size and screen quality as major selling points. Apple makes two types of claims about its screens: first, that that its screens have specific high resolutions, i.e. that they have a high pixel count relative to the size of the screen as tallied by multiplying the screen height in pixels by the screen width in pixels. Secondly, Apple represents that the phones' surface area is large, as calculated by measuring the diagonal length of the screen from corner to corner. However, Apple's iPhone X, iPhone XS, and iPhone XS Max phones (the "Products")[1] do not have the advertised screen resolution because they do not have the advertised number of screen pixels (2436×1125 in the iPhone X and XS, and 2688×1242 in the iPhone XS Max). Furthermore, they do not have the advertised screen size as conveyed by both Defendant's diagonal length representations and by Defendant's visual representations of the iPhone XS and iPhone XS Max.

2. The pixel deception is rooted in the misrepresentation of the Products' screens, which do not use true screen pixels. Defendant's nominal screen pixel resolution counts misleadingly count false pixels as if they were true pixels. This is in contrast to every other iPhone—phones whose screens Defendant *directly compares* to the iPhone X screen in its effort to mislead consumers into believing that the iPhone X has more pixels (and better screen resolution) than it really does.

3. The screen size deception is simply based on the facts that (1) Defendant rounds off the corners of the Products' screens and (2) the Products have non-screen notches at the top of their screens. Both these measures reduce Defendant's actual screen

---

[1] "The Products" encompass both the 64GB and 256GB versions of the iPhone X, as well as all other phone variants Defendant sold that are advertised with false resolutions due to the use of fake pixels and missing pixels, including the 64GB, 256GB, and 512 GB variants of the iPhone XS and iPhone XS Max, as well as Defendant's phones sold with missing pixels (but no fake pixels) such as the 64GB, 128GB, and 256 GB variants of the iPhone XR.

size, making its representations regarding screen size false and deceptive. That is, Defendant misrepresents the screen size of the Products by treating non-screen areas, such as the corners and the cut-out notch at the top of the screen, as though they were part of the screen.

**The Pixel Deception**

4.      One of the most important factors in the value and price of a phone is its screen quality, the most important factor of which is screen resolution. For this reason, Defendant's phones, including the Products, are advertised and marketed based on their screen resolution. On Defendant's website, as well as in the stores where the Products are sold, the Products are represented and advertised as having high-resolution screens. For example, the resolution specifications below are displayed on Defendant's website:



5.      Defendant's website is designed to encourage comparisons between the Products and Defendant's other supposedly inferior and antiquated phones. These comparisons are misleading because the Products[2] have false screen pixel counts that dramatically overrepresent the number of subpixels in the phones. Below is a screenshot from Defendant's website encouraging such false comparisons (highlighting added):[3]

---

[2] The iPhone XR Products have false pixel counts due to missing screen areas and a false representation of the pixel grid size, but do not use false pixels. The other Products have false pixel counts due to the use of false pixels and missing screen areas.

[3] https://www.apple.com/iphone/compare/ (Last accessed Aug. 27, 2018).

| Mac | iPad | iPhone | Watch | TV | Music | Support | Q |
|-----|------|--------|-------|-----|-------|---------|---|

# Compare iPhone models

See all models >

Use the drop-down menus to change models.





## Display

| Super Retina HD display | Retina HD display | Retina HD display |
|---|---|---|
| 5.8-inch (diagonal) all-screen OLED Multi-Touch display² | 5.5-inch (diagonal) widescreen LCD Multi-Touch display with IPS technology | 4.7-inch (diagonal) widescreen LCD Multi-Touch display with IPS technology |
| HDR display | — | — |
| 2436-by-1125-pixel resolution at 458 ppi | 1920-by-1080-pixel resolution at 401 ppi | 1334-by-750-pixel resolution at 326 ppi |

6.     The iPhone X Product is advertised as having 2436×1125 pixels, but in fact does not use true pixels with red, green, and blue subpixels in each pixel. Instead, the Product has only false screen pixels, with just two subpixels per false pixel (2436×1125×2 = 5,481,000 subpixels), and it does not actually have any screen at all in the notch at the top of the screen or in the display-area corners. In contrast, the iPhone 8 Plus has a higher quality screen than the Product, with more subpixels than the Product (1920×1080 pixels×3 subpixels per pixel = 6,220,800 subpixels).

7.     Defendant's comparisons of the Products to its other phones mislead consumers into believing that the Products have better screens than they actually do. Consumers, including Plaintiffs DAVIS and SPONCHIADO, relied on Defendant's marketing campaign depicting the Products as having superior screens than cheaper phones, including the iPhone 8 Plus, which has genuine pixels on its screen and is sold for less than the price of the Products.

8.     Similar false representations appear on the Products as they are sold in stores, where the phones have a built-in application to allow easy comparison among models.  For example, below is the iPhone X Product screen when using that application to compare the Product with the iPhone 8 Plus, displaying a false resolution in pixels and a false number of pixels per inch of screen:



FIRST AMENDED CLASS ACTION COMPLAINT – 4:18-cv-07533-HSG

**Screen Size Deception**

9.      Even if the Products' false pixels were construed as if they were real pixels, the Product's advertising would still be misleading because the Products contains less screen area than advertised.  Below is an image of the screen:



10.      Defendant and its agents represent that the iPhone XS screen is 5.8 diagonal inches (about 5 and 13/16 inches), but is only about 5.6875 inches (5 and 11/16 inches). The false size representation is premised on pretending that the screen does not have rounded corners. Each corner cuts the diagonal size by about 1/16 of an inch.   The

representation is also rendered deceptive by the presence of the notch (which Defendant goes out of its way to conceal, as detailed below).  The phone's diagonal measurement of 5.8 inches is meaningful to consumers because it is understood as an accurate proxy for the total screen area.  But the presence of the notch and the rounded corners means that it does not serve as an accurate proxy.  The same deception obtains with the iPhone XS Max, whose diagonal representation of 6.5 inches is rendered deceptive by the very same factors.

11.   The phones themselves display their false diagonal screen sizes, deceptively comparing the latter with the screen sizes of other phones whose screen size is not reduced by the rounded corners or the notch (as show in ¶ 8 above).

12.   Reasonable consumers would be deceived by the 5.8" representation—or the 6.5" representation in the case of the XS Max—even if they saw the rounded corners, since they would reasonably assume that these diagonal measurements referenced a rectangle that could actually be contained within the area of the actual device rather than a hypothetical rectangle whose hypothetical corners sit outside the device's actual screen area.

13.   Further, Defendant's advertising is designed to obscure the fact that the iPhone XS and iPhone XS Max have notches, as shown in ¶ 9 above, instead of actual screen at the top of the screen. Defendant advertises the screens of the iPhone XS and iPhone XS Max Products by using a color image of a planet, so that the notch will blend in with, and thus be camouflaged by, the black background of the image.  Conveniently for Defendant's deceptive marketing strategy, the planet ends right where the notch begins. These images are used on Defendant's website[5] to compare the Products to other phones:

_____

[5] https://www.apple.com/iphone/compare/ (Last accessed 9/25/18).



14.     Images that disguise the missing screen area in the XS and XS Max Products are prominent on Defendant's website,[6, 7] as well as in the advertisements of retailers that sell the Products.

---

[6] https://www.apple.com/iphone-xs/ (Last accessed 9/20/18).
[7] https://www.apple.com/iphone-xs/display/ (Last accessed 9/20/18).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





The missing screen area is imperceptible due to the black screen background

15.     Plaintiffs bring this proposed consumer class action on behalf of themselves and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Products for consumption and not for resale in the United States, including all 50 states and the District of Columbia.

16.     During the Class Period, Defendant manufactured, marketed and sold the Products throughout the United States, including California. Defendant purposefully misrepresented, and continues to misrepresent, both the screen size and screen quality of the Products.

17.     Defendant violates statutes enacted in each of the fifty states and the District of Columbia that are designed to protect consumers against false advertising and against unfair, deceptive, fraudulent, and unconscionable trade and business practices. These statutes include:

1. Alabama Deceptive Trade Practices Act, Ala. Statues Ann. § 8-19-1, *et seq.*;
2. Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;
3. Arizona Consumer Fraud Act, Arizona Revised Statutes, § 44-1521, *et seq.*;
4. Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;
5. California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;
6. Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;
7. Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;
8. Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;
9. District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*;
10. Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;
11. Georgia Fair Business Practices Act, § 10-1-390 *et seq.*;
12. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480-1, *et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.*;
13. Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;

14. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

15. Indiana Deceptive Consumer Sales Act, Indiana Code Ann. § 24-5-0.5-0.1, *et seq.*;

16. Iowa Consumer Fraud Act, Iowa Code § 714.16, *et seq.*;

17. Kansas Consumer Protection Act, Kan. Stat. Ann § 50 626, *et seq.*;

18. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et seq.*;

19. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1401, *et seq.*;

20. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*;

21. Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.*;

22. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

23. Michigan Consumer Protection Act, § 445.901, *et seq.*;

24. Minnesota Prevention of Consumer Fraud Act, Minn. Stat § 325F.68, *et seq.*, and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

25. Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;

26. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

27. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et seq.*;

28. Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.*;

29. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*;

30. New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*;

31. New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*;

32. New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*;

33. New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.*, and New York False Advertising Law, N.Y. Gen. Bus. Law § 350, *et seq.*;

34. North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15-01, *et seq.*;

35. *North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes § 75-1, et seq.*;

36. *Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. § 4165.01, et seq.*;

37. *Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, et seq.*;

38. *Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, et seq.*;

39. *Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § 201-1, et seq.*;

40. *Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, et seq.*;

41. *South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, et seq.*;

42. *South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws § 37-24-1, et seq.*;

43. *Tennessee Trade Practices Act, Tennessee Code Annotated § 47-25-101, et seq.*;

44. *Texas Stat. Ann. § 17.41, et seq., Texas Deceptive Trade Practices Act, et seq.*;

45. *Utah Unfair Practices Act, Utah Code Ann. § 13-5-1, et seq.*;

46. *Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, et seq.*;

47. *Virginia Consumer Protection Act, Virginia Code Ann. § 59.1-196, et seq.*;

48. *Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, et seq.*;

49. *West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, et seq.*;

50. *Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, et seq.*;

51. *Wyoming Consumer Protection Act, Wyoming Stat. Ann. § 40-12-101, et seq.*

18. Plaintiffs DAVIS, SPONCHIADO, and Class Members in all 50 states and the District of Columbia reasonably relied on Defendant's deceptive marketing campaign to purchase the Products when they would not have purchased them otherwise or would not have purchased them at their inflated purchase prices. Through these unfair and deceptive practices, Defendant has collected millions of dollars from the sale of its Products. Plaintiffs bring this action to stop Defendant's deceptive practices.

## **JURISDICTION AND VENUE**

19.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). This is a putative class action whereby: (i) the proposed class consists of over 100 class members; (ii) at least some of the proposed class members have a different citizenship from Defendant; and (iii) the amount in controversy exceeds the sum of value of $5,000,000.00, excluding interest and costs.

20.     The Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

21.     The Court has jurisdiction over the state law claims because they form part of the same case or controversy under Article III of the United States Constitution.

22.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

23.     This Court has personal jurisdiction over Defendant because their Products are advertised, marketed, distributed, and sold throughout California State; Defendant engaged in the wrongdoing alleged in this Complaint throughout the United States, including in California State; Defendant is incorporated in and are authorized to do business in California; and Defendant has sufficient minimum contacts with California and/or otherwise have intentionally availed themselves of the markets in California, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial and not isolated activity within California State, and Defendant APPLE INC. is incorporated in California State.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendant has caused harm to Class Members residing in this District, and the Plaintiff SPONCHIADO is a resident of this District under 28 U.S.C. 1391(c)(2) because it is subject to personal jurisdiction in this district.

1

## PARTIES

2

*Plaintiff Sponchiado*

3
4

25.     Plaintiff SPONCHIADO is a citizen of the State of California and resides in San Mateo County, California.

5
6
7
8
9
10
11

26.     In December 2017, Plaintiff SPONCHIADO went to an AT&T store located in San Francisco, where he was exposed to Defendant's false pixel claims and false diagonal length claims at the iPhone X display, as well as through a screen comparison app similar to the one in ¶ 8 above.  While he observed that the phone had rounded corners and a notch, he assumed that the 5.8" measurement referenced a rectangle that actually lay within screen area, as explained in ¶ 12 above—rather than one that extended beyond the rounded corners and overlapped with the notch.

12
13
14
15
16
17
18
19
20
21

27.     In reliance on these representations, Plaintiff SPONCHIADO then purchased the phone. The retail purchase price was approximately $1,149 for the phone. Plaintiff SPONCHIADO purchased the Product believing it would provide both the advertised screen size and the advertised screen quality; i.e., that it would have the advertised resolution as measured in pixels and pixels per inch.  However, the phone did not provide the advertised screen size or screen quality/resolution, both of which were less that Plaintiff SPONCHIADO had been led to expect on the basis of Defendant's pixel and diagonal length representations. As a result of his purchase, Plaintiff SPONCHIADO suffered injury in fact and lost money because the Product did not provide its advertised qualities and was worth less than the phone he had bargained for.

22
23
24

28.     Plaintiff SPONCHIADO intends to purchase Defendant's iPhone Products in the future and is concerned that Defendant's deception will lead him to pay an inflated price for them.

25

*Plaintiff Davis*

26
27
28

29.     Plaintiff DAVIS is a citizen of the State of New York and resides in Kings County, New York. In September 2018, Plaintiff DAVIS was exposed to Defendant's

screen claims regarding the iPhone XS Max in advertisements and online as part of Defendant's continuous marketing program, including its false pixel representations, false screen dimensions representations, and deceptive images obscuring the presence of the notch—as reproduced above in ¶¶ 13, 14.

30.     In reliance on Defendant's representations, Plaintiff DAVIS pre-ordered the 64 GB iPhone XS Max Product from Defendant online on or about September 29, 2018. The retail purchase price was approximately $1,099 for her Product. Plaintiff DAVIS purchased the Product believing it would provide the advertised screen size and screen quality.  The Product did not actually possess these, however.  Both were less than she had been led to expect on the basis of Defendant's representations.   As a result of her purchase, Plaintiff DAVIS suffered injury in fact and lost money because the Product did not provide the advertised screen quality, resolution, or size and was worth less than the phone she had bargained for.

31.     Plaintiff DAVIS intends to purchase Defendant's iPhone Products in the future and is concerned that Defendant's deception will lead him to pay an inflated price for them.

***Defendant***

32.     Defendant Apple Inc. ("Defendant") is a California corporation with its principal place of business located at 1 Infinite Loop, Cupertino, CA 95014.

<u>**FACTUAL ALLEGATIONS**</u>

<u>**Pixel Structure**</u>

33.     Smartphones are devices that rely on their digital display to communicate information to the user. Tiny units on the display screen (pixels) individually display a full range of colors, brightness, and shades, and these pixels combine to make up an image. Screen display size and image quality are determined by the number of pixels available in the display. For any screen size, an increased density of pixels, with more pixels in the same amount of space, results in a higher quality image.

34.     Every pixel on a screen is made of several smaller subpixels. Each subpixel can output exactly one color. When combined, subpixels form a "pixel" that can take on a wide range of colors and brightness. A pixel does this by lighting up different combinations of its sub pixels in different intensities. Traditionally, a pixel is made up of three subpixels: Red (R), Green (G), & Blue (B). Because these three colors are the primary colors, they can be combined make other colors. For example: Red and Green light combine to make Yellow light; Green and Blue light combine to make Cyan light; and Red and Blue light combine to make Magenta light. Red, Green, and Blue light can combine to make White light. See the images below for reference:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



35.    By changing the brightness of each subpixel, the overall pixel is able to display the full range of color with varying brightness and shades. See the color wheel below, illustrating the spectrum of color possible using different intensities of different combinations of Red, Blue, and Green light:



36.     This occurs because the three subpixels' color combines into a single color for the pixel. These subpixels are typically lined up on the screen in the following order: RGB_RGB_RGB_RGB-…, etc., with each RGB combination representing one pixel.[8]

37.     Each pixel is only lit up by its subpixels. If all of a pixel's subpixels are off, the pixel remains black because no subpixel (or combination of subpixels) is on.

38.     True screen pixels have at least one red subpixel, one blue subpixel, and one green subpixel, grouped together.

**Defendant's Screen Is Deceptively Advertised as Having More Pixels Than It Really Has**

39.     Defendant manufactures, distributes, markets, and sells phones nationwide, including the Products. The Products are marketed as possessing higher pixel resolution screens than they really have. Since launching the Products, Defendant has consistently conveyed its uniform deceptive message to consumers throughout the United States, including California. False statements about the Products were directly released by Defendant online and repeated at point of sale. See image below, showing Defendant's false online resolution statement regarding the iPhone X Product:

---

[8] It is also possible to align the red, blue, and green subpixels in a different order within a pixel. So long as each pixel contains at least one of each red, green, and blue subpixel, it will be fully capable of making every color. For example, in the Google Nexus 4, the blue subpixel is first, such that the layout is "BGR".



40.    The Products' screens omit half of the red and half of the blue subpixels in a display. Therefore, they have half of the advertised number of pixels and two thirds of the advertised number of subpixels. For example, where a traditional screen would have four pixels (and 12 subpixels, 4 of each primary color), Defendant removes every other red subpixel and every other blue subpixel, resulting in hardware with 8 subpixels (4 green, 2 red, and 2 blue) that is only capable of forming two true pixels (because there are only two red and two blue subpixels, and a true pixel needs at least one red, blue, and green subpixel).

41.    On the Product's screen, false pixels share fractions of neighboring red and blue subpixels as shown below, with each red and blue subpixel divided into quarters, and each false pixel containing two quarters of blue subpixels and two quarters of red subpixels. Below is an image showing six false pixels, as Defendant defines them:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



42.    Each false pixel contains one green subpixel, two quarters of red subpixels, and two quarters of blue subpixels. There are only half of the necessary number of red and

blue subpixels (the blue subpixel is not visible in a black-and-white print-out of this document).

43.     This means that the Products' false pixels cannot all freely make any color because each false pixel is unable to freely use the red and blue subpixels it shares with the adjacent false pixel. For example, if an image requires a blue pixel next to a red pixel, the image will be blurry because those two false pixels share red and blue subpixels. To make a blue pixel, red subpixels must be off and the blue subpixels must be on, whereas to make a red pixel, the red subpixels must be on and the blue subpixels must be off. It is impossible for the two adjacent false pixels to make a display of one red pixel and one blue pixel because they share subpixels, as shown above.

44.     Due to being based on fake pixels, the Products' screens omit half of the red and half of the blue subpixels in a display. Therefore, it has half of the advertised number of pixels and two thirds of the advertised number of subpixels. For example, where a traditional screen would have 16 pixels (and 48 subpixels), Defendant removes every other red subpixel and every other blue subpixel, resulting in only two real pixels (and 8 subpixels).

45.     The below diagrams show how Defendant abuses the concept of a pixel. The first grid consists of 36 subpixels, which comprise true 12 pixels, with each pixel possessing a red subpixel, a green subpixel, and a blue subpixel. The second grid shows how these are grouped into 12 true pixels:

| R | G | B | R | G | B |
|---|---|---|---|---|---|
| R | G | B | R | G | B |
| R | G | B | R | G | B |
| R | G | B | R | G | B |
| R | G | B | R | G | B |
| R | G | B | R | G | B |

Figure 1                        Figure 2

46.    The third grid shows the 24 subpixels Defendant includes in its 12 false pixels.[9] The fourth grid shows that the hardware can only physically comprise six true pixels (containing at least one red, one blue, and one green subpixel) at most:

| R | G | R | G |
|---|---|---|---|
| G | B | G | B |
| R | G | R | G |
| G | B | G | B |
| R | G | R | G |
| G | B | G | B |

Figure 3

| R | G | | R | G |
|---|---|---|---|---|
| G | B | | G | B |
| R | G | | R | G |
| G | B | | G | B |
| R | G | | R | G |
| G | B | | G | B |

Figure 4

47.    So, for every 12 red subpixels in a traditional screen, Defendant provides only 6 red subpixels. For every 12 blue subpixels in a traditional screen, Defendant provides only 6 blue subpixels. For every 12 green subpixels in a traditional screen, Defendant provides the appropriate 12 subpixels. So, in total, for every 36 subpixels in a traditional screen, Defendant provides only 24 subpixels. The result of omitting the red subpixels and blue subpixels from the screen that only six true pixels' worth of subpixels remain. Where a Product has six true pixels' worth of subpixels, Defendant misrepresents that the Product has twelve pixels. Defendant makes this same misrepresentation for the Product—

[9] The display layout tilts the square grid 45 degrees into a diamond grid.

regardless of its true pixel count, it is misrepresented as having more pixels than it really does.

48.     Correspondingly, the iPhone X Product's "2436×1125" screens should have 2,740,500 total pixels (2436×1125 = 2,740,500) and at least three subpixels in each pixel, i.e. 8,221,500 total subpixels (2,740,500 red subpixels, 2,740,500 green subpixels, and 2,740,500 blue subpixels). However, the screens actually have about half the appropriate number of red and blue subpixels, and therefore could only make about half the number of true pixels.

49.     Defendant does not provide extra green subpixels to consumers – it merely provides the correct number of green subpixels, but no more, and it only includes half of the promised number of red and blue subpixels. Defendant reduces its production costs by leaving out half of the blue and half of the red subpixels.

50.     Even though Defendant's screens could only make one real pixel for every four subpixels, Defendant advertises them as having one pixel for every two subpixels. It justifies this by counting red and blue subpixels as "shared" by pixels, splitting the subpixels into quarters between pixels. The shared subpixels are generally not able to simultaneously be the appropriate brightness for all of the false pixels they are shared between.

51.     In other words, Defendant is misleading reasonable consumers to believe that its Product screens provide the same clarity as would RGB screens of the advertised resolution. A genuine pixel has three subpixels—red, blue and green—and can therefore make any color, with every adjacent pixel also able to simultaneously make any color. The Product screens possess about 50% fewer red subpixels and about 50% fewer blue subpixels than advertised. The Product screens only have enough red subpixels and blue subpixels to comprise half of the advertised number of pixels.

**Defendant's Pixel Deception is Materially Deceptive to a Reasonable Consumer**

52.     The arbitrariness of Defendant's method of counting fractions of subpixels as pixels is made apparent by applying an analogous method to a standard RGB pixelated screen. It is trivially easy to draw imaginary boxes around portions of subpixels to arrive at a higher pixel count. Below is a diagram of nine subpixels combined to form three pixels:



53.     Below, those same subpixels are arbitrarily subdivided to form seven false pixels. Each false pixel is uniquely comprised of portions of red, green, and blue subpixels:



54.     Such a subdivision would be wholly misleading, and that is precisely the type of deception practiced by Defendant. What consumers reasonably expect when they see an advertised screen resolution denoted in pixels is that the screens in question have that many **actual** pixels, with each pixel able to create the full range of colors, not that some fanciful drawing of boxes could enclose fractions of each type of subpixel.

55.     As the result of its arbitrary pixel accounting, Defendant effectively claims that the Products possess a higher pixel count than they really do. Defendant consequently

claims that the Products have a higher screen quality than it really has, with about 33% more subpixels than the phones really have. The whole concept of the advertised screen resolution hinges on this deception.

56.   The Products only have half the advertised amount of red and blue subpixels, and so the Products' screens could—at most—only form half of the advertised number of true pixels. The subpixel count in the Products is about 33% lower than what the reasonable consumer expects, causing degraded screen qualities. This means that the reasonable consumer is being misled into purchasing a product with a lower pixel and subpixel count than expected.

57.   Defendant might argue that Plaintiffs are mistakenly comparing apples and oranges because the definition of a pixel that applies to traditional LCD screens (RBG) is inapplicable to the OLED technology used in the Products.  This line of argument is meritless for several reasons.

58.   In the first place, it is simply not the case that all OLED pixels "borrow" subpixels from neighboring pixels, as do those in the Products. Indeed, the Apple Watch uses OLED technology and its pixels are all true pixels comprised of one red, one blue, and one green subpixel.[10]

59.   Second, Defendant actively encourages consumers to "compare apples and oranges" when it invites them to compare the pixel dimensions and ppi of the Products with those of earlier versions of the Iphone using LCD technology.  For example[11]:

---

[10] https://support.apple.com/kb/sp766?locale=en_US (Last accessed 8/24/18)

[11] https://www.amazon.com/Apple-iPhone-GSM-Unlocked-5-8/dp/B075QNGDZL (Last accessed Aug. 10, 2018).



| | iPhone X | iPhone 8 Plus | iPhone 8 |
|---|---|---|---|
| Screen | 5.8" all-screen OLED | 5.5" widescreen LCD | 4.7" widescreen LCD |
| Display | Super Retina HD display | Retina HD display | Retina HD display |
| Screen resolution | 2436x1125 at 458ppi | 1920x1080 at 401ppi | 1334x750 at 326ppi |

60.    A reasonable consumer would assume that "ppi" refers to the same currency, not two completely divergent definitions of a pixel.  This assumption of a common currency is confirmed by Apple's representation that the iPhone XS and iPhone XS Max are "the sharpest displays, with the highest pixel density, on any Apple device."[12]  The comparison would be meaningless if "pixel" was a device-specific concept that Defendant is free to redefine at will.

61.    Such explicit comparisons aside, reasonable consumers assume that "pixel" or "ppi" as used to advertise the Products carries the familiar meaning that has always been

_____

12        https://web.archive.org/web/20180927123004/https://www.apple.com/iphone-xs/display/

employed in the marketing of Defendant's other iPhones and of cell phones generally. Absent a disclaimer to the contrary, reasonable consumers affix traditional meanings to traditional words. Thus, Defendant's promise of a certain resolution is reasonably understood by ordinary consumers to mean that the screens have at least one red subpixel, one green subpixel, and one blue subpixel per pixel.

62.     Third, Defendant's definition of "pixel" is also misleading according to normal technical understandings of the term.  The Merriam-Webster dictionary defines as pixel as "any of the small discrete elements that together constitute an image."[13] Dictionary.com defines a pixel as "the smallest element of an image that can be individually processed in a video display system."[14]  Wikipedia defines a pixel as  "the smallest controllable element of a picture represented on the screen."[15]

63.     Defendant's "pixels" are plainly fraudulent by these traditional definitions. They are not "discrete" because each "pixel" shares its blue and red subpixels with <u>eight</u> other surrounding pixels.  *See* ¶ 41 above.  Because such pixels are not discrete, they are also not "individually processed" or "controllable." As explained in ¶ 43 above, the color that any given pixel can produce is constrained by the color being produced by neighboring pixels (since they share some of the same subpixels).

64.     Perhaps RBG is not the only legitimate pixel layout.  Many high-end screens add subpixels to each pixel, using RGBW or RGBY pixels on their screens, with an extra, fourth subpixel per pixel in addition to the base RGB subpixels. Such screens have an extra subpixel added to each basic RGB pixel, and these screens therefore have four subpixels per pixel.  But such pixels, though different, do conform to the minimal requirements of a pixel, being discrete and independently controllable, which cannot be said of Defendant's

---

[13] https://www.merriam-webster.com/dictionary/pixel
[14] https://www.dictionary.com/browse/pixel
[15] https://en.wikipedia.org/wiki/Pixel

fraudulent "pixels."  By contrast with the latter, RGBW and RGBY pixels give consumers *more*, *not less*, than they reasonably expected.

**Defendant's Screen Size Deception is Materially Deceptive to a Reasonable Consumer**

65.    Reasonable consumers care about how much screen space their phones actually contain.  Such is proven by the fact that screen sizes as represented by diagonal measurements are routinely promoted to consumers as important aspects of phones.

66.    Reasonable consumers would be deceived by Defendant's gambit to camouflage the presence of a notch on the iPhone XS and iPhone XS Max.  Some of the XS and XS Max images lower down on Defendant's XS and XS Max webpage[16] might suggest the presence of the notch.  But reasonable consumers would not scroll down to read these, since they would mistakenly but reasonably assume that the first, largest, and most prominent image—which did camouflage the notch—was an accurate representation of the actual phone (especially when this is the primary image with which Defendant advertises the phone generally).  Moreover, most of the few notch-visible representations on Defendant's website are not clearly labeled as XS or XS Max iPhones.

67.    Reasonable consumers would also be deceived by Defendant's diagonal length representations—i.e., 5.8" or 6.5".  A small and obscure footnote at the bottom of Defendant's XS and XS Max webpage[17] does disclose that these phones' actual screen area is less than is indicated by the diagonal measurements.  However, the "1" which links the diagonal measurement to the disclosure was placed after "Super Retina Custom OLED display," <u>not</u> after the actual diagonal measurement.  *See* ¶ 14, above (pg. 11).  Thus, a reasonable consumer would naturally assume that the reference contained additional information about Defendant's OLED technology, not additional information that would

---

[16] https://web.archive.org/web/20180927123004/https://www.apple.com/iphone-xs/display/
[17] https://web.archive.org/web/20180927123004/https://www.apple.com/iphone-xs/display/

affect the significance of the diagonal measurements. Nothing prevented Defendant from placing a disclosure such as "actual screen area is less owing to rounded corners and upper notch" immediately under the diagonal measurements, where it could not be missed.

**Plaintiffs and the Class Were Injured By Defendant's Misleading Representations**

68.     Defendant has succeeded in its deceit and has reaped monetary benefits from its deceptive campaigns advertising the Products. Such profit would not have occurred without Defendant's deceptive and misleading marketing and advertising campaign because consumers would have purchased other, similar phones that were truthfully advertised with accurate representations as to both screen size and pixel count.

69.     Defendant advertises screens that are higher in both quantity and quality than what is actually delivered to consumers. This misleads consumers into overpaying for phones. Plaintiffs and the other members of the Classes paid the price for the Products because they did not know that Defendant's claims about them were false and misleading.

70.     As a result of Defendant's deceptive marketing, Plaintiffs and the Class Members have been harmed in their purchases of the Products. The value of the Products as warranted was less than the value of the Products as delivered.

71.     As the manufacturers, sellers, and/or distributors of the Products, Defendant possesses specialized knowledge regarding the make-up and screen quality of the Products.

72.     As a result of Defendant's deceptive pixel claim, Plaintiffs and other members of the proposed Classes have purchased the Product which does not perform as advertised. Defendant has reaped enormous profits from its false, misleading and deceptive marketing and sale of the Products. Plaintiffs and members of the proposed Classes have been deceived and misled by Defendant's deceptive pixel resolution claim.

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs seek relief in her individual capacity and as representative of all others who are similarly situated. Pursuant to Rule 23(a), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following classes:

**The Nationwide Class**

74.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class (the "Nationwide Class"):

> All retail consumers who purchased or financed the Product in the United States, including all 50 states and the District of Columbia, during the applicable statute of limitations period and/or such subclasses as the Court may deem appropriate, until the date of notice is disseminated.

75.     California law applies to the claims of all U.S. purchasers. In the alternative, if the Court finds that California law does not apply to all members of the Nationwide Class, Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Nationwide Class and State Subclasses. Each State Subclass consists of:

> All retail consumers who purchased or financed the Product in that state within the applicable statute of limitations period, and/or such subclasses as the Court may deem appropriate, until the date of notice is disseminated.

**The California Class**

76.     In the alternative, should a Nationwide Class under California law not be certified, Plaintiff CHRISTIAN SPONCHIADO seeks to represent the following Class or Subclass (the "California Class"):

> All retail consumers who purchased or financed the Product in California within the applicable statute of limitations period, and/or such subclasses as the Court may deem appropriate, until the date of notice is disseminated.

**The New York Class**

77.     Also in the alternative, should a Nationwide Class under California law not be certified, Plaintiff COURTNEY DAVIS seeks to represent the following Class or Subclass (the "New York Class"):

All retail consumers who purchased or financed the Product in New York within the applicable statute of limitations period, and/or such subclasses as the Court may deem appropriate, until the date of notice is disseminated.

78.     Excluded from the Classes (Collectively the Nationwide Class and the state Class comprise the "Classes") are Defendant's current and former officers, directors, and employees, and those who purchased the Product for the purpose of resale. Also excluded from the Class is the judicial officer to whom this lawsuit is assigned.

79.     Plaintiffs reserve the right to revise the Class definitions based on facts learned in the course of litigating this matter.

80.     *Numerosity*. While the exact number and identities of purchasers of the Product are unknown to Plaintiffs at this time, Plaintiffs are informed and believe that the Nationwide Class, California Class, and New York Class contain thousands of purchasers ("Class Members") and are so numerous that individual joinder of all Class Members is impracticable.

81.     In the alternative, if the Court finds that California law does not apply to all members of the Nationwide Class, Plaintiffs are informed and believe each State Subclass contains thousands of purchasers ("Class Members") and are so numerous that individual joinder of all Class Members is impracticable.

82.     ***Existence and Predominance of Common Questions of Law and Fact***. Common questions of law and fact arise from Defendant's conduct described herein. Such questions are common to all Class Members and predominate over any questions affecting only individual Class Members and include:

   a.   Whether the claims discussed above are true, or are misleading, or objectively likely to deceive;

   b.   Whether Defendant's marketing and advertising of the Product is false, fraudulent, deceptive, unlawful, or misleading;

   c.   Whether Defendant has breached warranties made to the consuming public about their Product;

d.  Whether Defendant's marketing, promotion, advertising and sale of the Product is and was a deceptive act or practice in the conduct of business directed at consumers, giving rise to consumer law violations in all other jurisdictions;

e.  Whether Plaintiffs and members of the Classes sustained monetary loss and the proper measure of loss;

f.  Whether Defendant's conduct constitutes unjust enrichment, and whether equity calls for disgorgement of unjustly obtained or retained funds, restitution to, or other remedies for the benefit of the Classes;

g.  Whether Plaintiffs and other members of the Classes are entitled to other appropriate remedies, including equitable relief; and

h.  Whether Defendant's conduct rises to the level of reprehensibility under applicable law such that the imposition of punitive damages is necessary and appropriate to fulfill the societal interest in punishment and deterrence, and the amount of such damages and/or their ratio to the actual or potential harm to the Class.

83.    In the alternative, if the Court finds that California law does not apply to all members of the Nationwide Class, consumer fraud laws among the 50 states and the District of Columbia are substantially uniform in their treatment of Defendant's deceptive practices such that a realistic plan exists for adjudicating the claims of the Nationwide Class under each state's laws.

84.    *Typicality*. Plaintiffs' claims are typical of those of the Class Members because, *inter alia*, Plaintiffs and the other Class Members were all injured by same uniform conduct, as detailed herein, and were subject to Defendant's pixel claims that accompanied each and every Product. In addition, nowhere did product advertising clearly warn consumers about the Product's true subpixel count or screen size. Plaintiffs are advancing the same claims and legal theories on behalf of herself and all members of the Classes.

85.     ***Adequacy of Representation***. Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained competent counsel experienced in prosecuting nationwide class actions. Plaintiffs understand the nature of their claims herein, have no disqualifying conditions, and will vigorously represent the interests of the Classes and/or State Subclasses. Neither Plaintiffs nor Plaintiffs' counsel has any interests that conflict with or are antagonistic to the interests of the Classes or State Subclasses.

86.     ***Superiority***. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by any individual Class Member is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. Thus, it would not be economically feasible for an individual Class Member to prosecute a separate action on an individual basis, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

87.     The prerequisites to maintaining a class action for equitable relief pursuant to Rule 23(b)(2) are also met, as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

88.     In the alternative, if the Court finds that California law does not apply to all members of the Nationwide Class, a Nationwide Class applying the laws of individual states is superior to other methods of resolving this controversy. Individual states' consumer fraud law has little substantive variation as applied to this case. To the extent that state laws vary, "relatively minor variations . . . may be handled at trial 'by grouping similar state laws together and applying them as a unit.'" *In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010) (*quoting In re Prudential Ins. Co. Am. Sales Prac. Litig.*, 148 F.3d 283, 315 (3d Cir. 1998)).

89.    Plaintiffs seek preliminary and permanent equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendant from engaging in the acts described, and requiring Defendant to provide full restitution to Plaintiffs and Class Members.

90.    Unless a Class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiffs and Class Members.

## CAUSES OF ACTION

## COUNT I.

## VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, (Cal. Civ. Code § 1750, *et seq.*)

*(Brought Individually and on behalf of the Nationwide Class under California Law; Alternatively, brought Individually and on behalf of the California Class)*

91.    Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

92.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class for an injunction, restitution, and damages for Defendant's violations of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, including section 1761(d).

93.    Alternatively, Plaintiff CHRISTIAN SPONCHIADO brings this claim individually and on behalf of the California Class for an injunction, restitution, and damages for Defendant's violations of the CLRA.

94.    Plaintiffs and Class Members are consumers who purchased or leased the Products for personal, family or household purposes. Plaintiffs and Class Members are "consumers" as that term is defined by the CLRA. Cal. Civ. Code § 1761(d). Plaintiffs and Class Members are not sophisticated experts with independent knowledge of either (a) optical engineering, or (b) corporate branding, labeling and packaging practices.

95.    Phones that Plaintiffs and other members of the Classes purchased from Defendant were "goods" within the meaning of the CLRA. Cal. Civ. Code § 1761(a).

96.     Defendant's actions, representations, and conduct have violated and continue to violate the CLRA, because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers.

97.     Defendant violated federal and California law because the Products are falsely advertised and because they are intentionally packaged to mislead consumers and to prevent the consumer from being able to determine that they are falsely advertised.

98.     California's Consumers Legal Remedies Act prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have." Cal. Civ. Code § 1770(a)(5). By engaging in the conduct set forth herein, Defendant violated and continues to violate section 1770(a)(5) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendant misrepresents that the Products have quantities of pixels and subpixels that they do not have, and screen sizes that they do not have.

99.     The CLRA further prohibits "[a]dvertising goods or services with intent not to sell them as advertised." Cal. Civ. Code § 1770(a)(9). By engaging in the conduct set forth herein, Defendant violated and continue to violate section 1770(a)(9), because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it advertises goods with the intent not to sell the goods as advertised. Defendant instead sells cell phones (the "Products") with worse screens than advertised.

100.    Plaintiffs and Class Members acted reasonably when they purchased the Products based on their belief that Defendant's representations were true and lawful.

101.    Plaintiffs and members of the Classes suffered injuries caused by Defendant because (a) they would not have purchased the Products on the same terms absent Defendant's illegal and misleading conduct as set forth herein; (b) they paid a price

premium for the Products due to Defendant's misrepresentations and deceptive packaging; and (c) the Products did not have the qualities as promised.

102.   On or about October 5, 2018, prior to filing this action, a CLRA notice letter was served on Defendant which complies in all respects with California Civil Code section 1782(a). Plaintiffs sent to Defendant, on behalf of himself and the proposed Nationwide Class and California Class, a letter via certified mail, return receipt requested, advising Defendant that it is in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. A true and correct copy of Plaintiffs' letter is attached hereto as **Exhibit A**.

103.   Wherefore, Plaintiffs seeks damages, restitution, and injunctive relief for these violations of the CLRA.

## <u>COUNT II.</u>

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, (California Business & Professions Code § 17200, *et seq.*)

*(Brought Individually and on behalf of the Nationwide Class under California Law; Alternatively, brought Individually and on behalf of the California Class)*

104.   Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

105.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class for an injunction and damages for Defendant's violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

106.   Alternatively, Plaintiff CHRISTIAN SPONCHIADO brings this claim individually and on behalf of the California Class for an injunction and damages for Defendant's violations of the UCL.

107.   The UCL provides, in pertinent part: "[U]nfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ." Cal. Bus. & Prof. Code § 17200.

108.   Defendant violated federal and California law because the Products are falsely advertised and because they are intentionally packaged to mislead consumers and prevent the consumer from being able to determine that they are falsely advertised.

109.   Defendant's business practices, described herein, violated the "unlawful" prong of the UCL by violating the CLRA, and other applicable law as described herein.

110.   Defendant's business practices, described herein, violated the "unfair" prong of the UCL in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits. Defendant's advertising is of no benefit to consumers, and its false assertions and omissions concerning the screen quality and pixel and subpixel count of the Product offends public policy.

111.   Defendant violated the "fraudulent" prong of the UCL by misleading Plaintiffs and members of the Classes to believe that the Products contained more pixels and subpixels than they actually do—i.e. that they have a higher-quality screen than they actually have—and that such packaging and labeling practices were lawful, true and not intended to deceive or mislead the consumers.

112.   Plaintiffs and members of the Classes are not sophisticated experts about the corporate branding, labeling, and packaging practices of the Products. Plaintiffs and members of the Classes acted reasonably when they purchased the Products based on their belief that Defendant's representations were true and lawful.

113.   Plaintiffs and members of the Classes lost money or property as a result of Defendant's UCL violations because (a) they would not have purchased their purchased Products on the same terms absent Defendant's illegal conduct as set forth herein, or if the true facts were known concerning Defendant's representations; (b) they paid a price premium for the Products due to Defendant's misrepresentations; and (c) the Products did not have the qualities as promised.

## COUNT III.

### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW,
(California Business & Professions Code § 17500, *et seq.*)

*(Brought Individually and on behalf of the Nationwide Class under California Law;
Alternatively, brought Individually and on behalf of the California Class)*

114.    Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

115.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class for an injunction and damages for Defendant's violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

116.    Alternatively, CHRISTIAN SPONCHIADO brings this claim individually and on behalf of the California Class for an injunction and damages for Defendant's violations of the FAL.

117.    By enacting the FAL, the State of California has made it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." Cal. Bus. & Prof. Code § 17500.

118.    Defendant engaged in a scheme of offering misbranded Products for sale to Plaintiffs and members of the Classes by way of packaging the Products with inferior screens containing less than the advertised number of pixels and subpixels. Such practice misrepresented the content, screen size, screen quality, and pixel and subpixel quantity of the misbranded Products. Defendant's advertisements and inducements were made in California and come within the definition of advertising as contained in the FAL, in that the Products' packaging was intended as inducements to purchase Defendant's Products. *See* Cal. Bus. & Prof. Code § 17500, *et seq.* Defendant knew that these statements were unauthorized, inaccurate, and misleading.

119.   Defendant violated federal and California law because the Products are falsely advertised and because they are intentionally packaged to mislead consumers and prevent the consumer from being able to determine that it is falsely advertised.

120.   Defendant violated the FAL by misleading Plaintiffs and the members of the Classes to believe that the advertised representations about pixel and subpixel count and screen size constituted true representations about the Products as described herein.

121.   Defendant knew or should have known, through the exercise of reasonable care, that the Products were and continue to be misbranded, and that its representations about the Products' (a) screen size, (b) screen quality, and (c) pixel and subpixel count were untrue and misleading.

122.   Plaintiffs and the members of the Classes lost money or property as a result of Defendant's FAL violations because (a) they would not have purchased their purchased Products on the same terms absent Defendant's illegal conduct as set forth herein, or if the true facts were known concerning Defendant's representations; (b) they paid a price premium for the Products due to Defendant's misrepresentations; and (c) the Products did not have the characteristics, benefits, or qualities as promised.

## COUNT IV.

### VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES ACT
### (N.Y. Gen. Bus. Law § 349, *et seq.*)

*(Alternatively, brought Individually and on behalf of the New York Class.)*

123.   Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

124.   Plaintiff brings this claim individually and on behalf of the Nationwide Class for an injunction and damages for Defendant's violations of.

125.   In the alternative, COURTNEY DAVIS brings this claim individually and on behalf of the New York Class for an injunction and damages for Defendant's violations of New York's Deceptive Acts and Practices Law, Gen. Bus. Law ("NY GBL § 349").

126.   Defendant's business acts and practices and/or omissions alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

127.   The practices of Defendant described throughout this Complaint, were specifically directed to consumers and violate the NY GBL § 349 for, inter alia, one or more of the following reasons:

    a.  Defendant engaged in deceptive, unfair and unconscionable commercial practices in failing to reveal material facts and information about the Product, which did, or tended to, mislead Plaintiff COURTNEY DAVIS and the Class about facts that could not reasonably be known by them;

    b.  Defendant failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

    c.  Defendant caused Plaintiff COURTNEY DAVIS and the Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through their conduct;

    d.  Defendant failed to reveal material facts to Plaintiff COURTNEY DAVIS and the Class with the intent that Plaintiff COURTNEY DAVIS and the Class Members rely upon the omission;

    e.  Defendant made material representations and statements of fact to Plaintiff COURTNEY DAVIS and the Class that resulted in Plaintiff COURTNEY DAVIS and the Class reasonably believing the represented or suggested state of affairs to be other than what they actually were;

    f.  Defendant intended that Plaintiff COURTNEY DAVIS and the members of the Class rely on their misrepresentations and omissions, so that Plaintiff COURTNEY DAVIS and Class members would purchase the Products; and

    g.  Defendant knowingly and falsely represented and advertised that the Products have an inflated pixel resolution.

128.   Under all of the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices were malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

129.   Defendant's actions impact the public interest because Plaintiff COURTNEY DAVIS and members of the Class were injured in exactly the same way as thousands of others purchasing the Product as a result of and pursuant to Defendant's generalized course of deception.

130.   By committing the acts alleged in this Complaint, Defendant has extracted a high price from Plaintiff COURTNEY DAVIS and the Class by inducing an erroneous belief that the Products have higher quality screens than they really do, with more pixels and subpixels than they really have. This is a deceptive business practice that violates NY GBL § 349.

131.   Defendant's pixel claims misled Plaintiff COURTNEY DAVIS, and they are likely to mislead other reasonable consumers in the future. Specifically, as a result of Defendant's false advertising, Plaintiff COURTNEY DAVIS and other Class members suffered monetary losses associated with the purchase of the Products because they possess inferior screens with smaller size, lower quality, and lower pixel and subpixel count than advertised. The Products were consequently worth far less than what Plaintiff COURTNEY DAVIS and Class Members had bargained for.

132.   The foregoing deceptive acts, omissions and practices were directed at consumers.

133.   The foregoing deceptive acts, omissions and practices set forth in connection with Defendant's violations of NY GBL § 349 proximately caused Plaintiff COURTNEY DAVIS and other members of the Class to suffer actual damages in the form of, inter alia, monies spent to purchase the Products, and are entitled to recover such damages, injunctive relief, together with equitable and declaratory relief, appropriate damages, including punitive damages, attorneys' fees and costs.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT V.

### VIOLATIONS OF THE NEW YORK FALSE ADVERTISING LAW
### (N.Y. Gen. Bus. Law § 350, *et seq.*)

*(Alternatively, brought Individually and on behalf of the New York Class.)*

134.   Plaintiff realleges and incorporates herein by reference all allegations contained above as if fully set forth herein and further allege as follows:

135.   Plaintiff brings this claim individually and on behalf of the Nationwide Class for violations of New York's False Advertising Law, Gen. Bus. Law ("NY GBL § 350").

136.   Alternatively, COURTNEY DAVIS brings this claim individually and on behalf of the New York Class for violations of NY GBL § 350.

137.   NY GBL § 350 provides that false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state are unlawful.

138.   NY GBL § 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect."

139.   Any person who has been injured by reason of any violation of the NY GBL may bring an action in his own name to enjoin unlawful act or practice, an action to recover his actual damages or five hundred dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to ten thousand dollars, if the court finds the Defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

140.   As fully alleged above, by advertising, marketing, distributing, labeling and selling mislabeled Products utilizing lower quality screens than advertised to Plaintiff COURTNEY DAVIS and other members of the Class, Defendant engaged in, and continues to engage in, false advertising.

141.   Defendant engaged in false advertising by advertising, marketing, distributing and selling the Products with false pixels as if they possessed a higher pixel count than they

have, when Defendant knew that the Products were missing 33% of the subpixels advertised.

142.   Defendant's conduct was directed at consumers.

143.   Justifiable reliance is not required for a § 350 claim. See *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012).

144.   Plaintiff COURTNEY DAVIS and other members of the Class further seek to enjoin such unlawful deceptive acts and practices as described above. Each of the members of the Class will be irreparably harmed unless Defendant is enjoined from falsely advertising its Products with inflated pixel counts as described herein.

145.   Plaintiff COURTNEY DAVIS and other members of the Class suffered a loss as a result of Defendant's false advertising. Specifically, as a result of Defendant's false advertising, Plaintiff COURTNEY DAVIS and other Class members suffered monetary losses associated with the purchase or lease of the Products because the Products were less valuable than advertised.

146.   In this regard, Defendant has violated, and continues to violate, NY GBL § 350, which makes false advertising unlawful. As a direct and proximate result of Defendant's violation of NY GBL § 350 above, Plaintiff COURTNEY DAVIS and other members of the Class have suffered damages in an amount to be determined at trial.

## COUNT VI

## COMMON LAW FRAUD

*(brought Individually and on behalf of the Nationwide Class or, alternatively, the New York and California Classes)*

147.   Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs and further allege as follows:

148.   Defendant intentionally makes materially false and misleading representations regarding the nature of the Products.

149.   Plaintiffs and Class members reasonably relied on Defendant's false and misleading representations. They did not know, and had no reason to know, that the Products' screen size and pixel representations were false and deceptive.

150.   Defendant knew and intended that Plaintiffs and Class members would rely on its misrepresentations.

151.   Plaintiffs and Class members have been injured as a result of Defendant's fraudulent conduct.

152.   Defendant is liable to Plaintiffs and Class members for damages sustained as a result of Defendant's fraud.


## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, seek judgment against Defendant, as follows:

     a.  An Order that this action be maintained as a class action and appointing Plaintiffs as representative of the Class;

     b.  An Order appointing the undersigned attorneys as class counsel in this action;

     c.  An Order awarding all applicable compensatory, statutory, and punitive damages;

     d.  An Order awarding restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to Plaintiffs and the proposed Class Members;

     e.  An Order awarding declaratory relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of their conduct and pay them all money it is required to pay;

f.   An Order awarding statutory pre-judgment and post-judgment interest on any amounts;

g.   An Order awarding attorneys' fees and costs; and

h.   An Order awarding such other relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the Classes, demand a trial by jury on all questions of fact raised by the Complaint.

Dated this 24th day of April, 2019.

Respectfully submitted,

By:  */s/  C.K. Lee*
C.K. Lee, Esq.

*/s/ David. A. Makman*
David A. Makman, Esq.

*Attorneys for Plaintiffs and the Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2019, true and correct copies of Plaintiffs' First Amended

Class Action Complaint were served on all counsel of record via ECF.

*/s/ C.K. Lee*
C.K. Lee, Esq.